Leonard **VILLARI** and Annette Villari, individually and on behalf of their minor children Marnie, Leonard, Heidi, Heather, Joshua and Annette Villari

v.

**TERMINIX INTERNATIONAL, INC.**

Civ. A. No. 85–1363.

United States District Court, E.D. Pennsylvania.

June 24, 1987.

David F. Simon, Pamela S. Goodwin, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for plaintiffs.

Mitchell S. Pinsly, Edward L. Edelstein, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, Pa., Edward J. Carreiro, Jr., Jenkintown, Pa., for defendant.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

This diversity action was brought by Leonard and Annette Villari, individually and on behalf of their minor children, against Terminix International, Inc. ("Terminix"), a corporation in the business of pest control. Plaintiffs allege that Terminix contaminated their home with a hazardous termiticide in 1983. Their complaint is in multiple counts, and raises a number of distinct legal theories. Terminix has moved for partial summary judgment.

Pursuant to a contract with Leonard Villari, Terminix treated the Villari family home at 911 Moore Street, Philadelphia, with various chemicals used for termite control over a period of years. The method of termite control employed by Terminix is to apply chemicals in such a way as to create a chemical barrier between the house and the soil on which it rests. The contract provided for annual reinspections and additional treatments when necessary to maintain the chemical barrier.

On October 17, 1983, a Terminix employee performed an additional treatment using a termiticide known as Aldrin. Aldrin, a chlorinated hydrocarbon, was approved by the federal Environmental Protection Agency for subsurface ground insertion for termite control. Federal scientific research agencies conducted studies of Aldrin in response to documentation of Aldrin contamination of military housing.[1] The National Academy of Sciences set an interim airborne level for Aldrin of one microgram per cubic foot of air. A toxicologist at Region III of the Environmental Protection Agency has concluded that although there is no proof that Aldrin is carcinogenic in humans, "prudent public health policy and reasonable scientific consideration enables me to conclude that aldrin should be

---

1. The particular problem was contamination through seepage of Aldrin into heating ducts, due to the construction methods employed in the type of military housing in question.

considered a cancer causing chemical in man." Plaintiffs' Exhibit 17. The state of New York has banned Aldrin for residential use, and Terminix no longer uses Aldrin.

In the course of treating the Villari residence, for reasons that are disputed, a quantity of Aldrin spilled into the Villaris' basement. The Terminix employee made efforts to remove the puddle of Aldrin from the basement floor. Annette Villari testified that the employee used the family's household mops and rags, which were later used by Annette Villari elsewhere in the house.

Annette Villari testified that all members of the family suffered headaches, nausea, dizziness and general malaise in the month after the spill, but did not at the time connect their symptoms with the spill. The Villaris did, however, become concerned about the consequences of the spill for the bottles of homemade wine that were fermenting in their basement, and asked Terminix to test the wine. Several weeks later, the Villaris contacted state and federal environmental agencies; the agencies suggested that the Villaris arrange to have the air in their home tested as well. The Villaris commissioned air sampling tests, and informed Terminix that tests revealed a level of 8.7 micrograms of Aldrin per cubic meter of air.

A month after the spill, Terminix relocated the Villari family to two hotel rooms to permit Terminix to decontaminate the house pursuant to an agreement to reduce the Aldrin contamination to specified levels. Four months later, in April 1984, the Villaris were informed by Terminix's insurance carrier that the clean-up was substantially complete and that their hotel expenses would no longer be paid. The Villaris had further tests performed in May 1984, and were not satisfied with the results of the clean-up. The Pennsylvania Department of Agriculture instructed Terminix by letter that, because the Villaris use their basement as a play area for their children, further clean-up was needed. For reasons that are disputed, the work was not performed.

The Villaris testified that these events placed considerable strain on family life. Crowded conditions in the hotel, and loss of the additional space their basement had provided, caused the family to decide that the two oldest children should live away from home. These circumstances, along with general fears of future medical problems due to Aldrin exposure, caused Mrs. Villari in particular to feel inadequate as a parent.

Terminix's motion for partial summary judgment is based in part on questions of law and in part on challenges to the factual record after discovery. The motion shall be granted in part and denied in part.

I. *Strict Products Liability*

█ Count VII of the complaint states a claim for strict liability under section 402A of the Restatement (Second) of Torts. The Villaris allege that Terminix sold or distributed unreasonably dangerous insecticides and failed to warn the Villaris of the danger.

Terminix argues that this claim must fail because the Villaris cannot demonstrate that Aldrin is a defective product. We disagree. Under section 402A, a product may be defective because it fails to carry warnings concerning the risks of foreseeable improper uses. The Villaris have, in our view, presented sufficient evidence to permit a reasonable jury to infer that Aldrin is hazardous if inhaled, that Aldrin was introduced into their home without proper warnings as to that danger, and that Aldrin is defective as a product in the absence of proper warnings.

Terminix also argues that the Villaris have failed to produce sufficient evidence that they suffered physical harm as a result of their exposure to Aldrin. In her deposition testimony, Annette Villari stated that members of the Villari family suffered headaches, nausea, dizziness, and general malaise in the month after the spill. Dr. G. John DiGregorio, whose qualifications as an expert are unchallenged, issued a report in which he concluded that the symptoms suffered by the Villaris are consistent with the effects of exposure to Aldrin. We con-

clude that this evidence—although admittedly not as strong as contemporaneous diagnosis by a treating physician—is sufficient to permit a reasonable jury to conclude that the Villaris suffered physical harm as a result of Aldrin exposure.

■ Terminix also argues that it cannot be held liable under section 402A because it provided a *service* rather than a *product*. There is no doubt that Terminix supplied the termiticides it applied to the Villari residence. Indeed, the evidence reveals that Terminix, under contract with the manufacturer of Aldrin, was at the time of the spill the *sole* supplier of Aldrin in the United States. Put more precisely, then, Terminix's argument is that one who supplies a product in the course of performing a service cannot be held liable under Restatement (Second) of Torts § 402A for defects in the product. Although the question is an unsettled one under Pennsylvania law, we conclude that the courts of Pennsylvania would, when faced with the issue, find liability in such circumstances under section 402A.

In *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975), the Supreme Court of Pennsylvania explained that "[t]he law of products liability developed in response to changing societal concerns over the relationship between the consumer and the seller of a product." 337 A.2d at 898. Consistent with those concerns, the court explained that the term "seller" must, for purposes of section 402A, be interpreted broadly

> to include all suppliers of products who, because they are engaged in the business of selling or supplying a product, may be said to have "undertaken and assumed a special responsibility" toward the consuming public and are in a position to spread the risk of defective products. Restatement (Second) of Torts § 402A, comment c. The actual form of the transactions of such suppliers, whether by sale, lease, or bailment, should not alter their obligations.

*Id.* at n. 3.

Although the Pennsylvania Supreme Court has yet to address the question of whether one who supplies a product in the course of performing a service may be held liable as a seller under section 402A, the Supreme Court of New Jersey has, out of concerns quite similar to those expressed by the Pennsylvania Supreme Court in *Berkebile*, answered that question in the affirmative. In *Newmark v. Gimbel's Inc.*, 54 N.J. 585, 258 A.2d 697 (1969), the Supreme Court of New Jersey held that a beauty salon which supplied and applied a defective permanent wave solution was subject to strict tort liability for defects in the product. To hold otherwise, the court held, would "put[ ] excessive emphasis on form and downgrade[ ] the overall substance of the transaction." 258 A.2d at 701. The court explained:

> A beauty parlor operator in soliciting patronage assures the public that he or she possesses adequate knowledge and skill to do the things and to apply the solution necessary to produce the permanent wave in the hair of the customer. When a patron responds to the solicitation she does so confident that any product used in the shop has come from a reliable origin and can be trusted not to injure her. She places herself in the hands of the operator relying upon his or her expertise *both* in the selection of the products to be used on her and in the method of using them. The ministrations and the products employed on her are under the control and selection of the operator; the patron is a mere passive recipient.

*Id.*

We find these observations particularly applicable to the case before us. Terminix was the sole supplier of Aldrin at the time of the spill, and its standard "Subterranean termite control proposal" stated that one of the reasons "Terminix protects you better" is that "Terminix entomologists maintain constant EPA standards with exclusive Terminix chemical formulations for best and safest results." Plaintiff's Exhibit 20. Against that background it seems not unreasonable to conclude that Terminix has, within the framework of the concerns addressed by the Pennsylvania Supreme Court in *Berkebile*, "undertaken and as-

sumed a special responsibility toward the consuming public." *Berkebile*, 337 A.2d at 898 n. 3. To require a consumer of the product to pursue the manufacturer directly would belie one of the goals of products liability law—to respond to the realities of the distribution of products in a changing society.

The view that one who supplies a product in the course of provided services is not strictly liable in tort has been much criticized, *see, e.g.,* Note, *Products and the Professional: Strict Liability in the Sale-Service Hybrid Transaction,* 24 Hastings L.J. 111 (1972), as has the related view that warranties under the Uniform Commercial Code are not applicable to the transfer of goods in connection with the provision of services, *see, e.g.,* Farnsworth, *Implied Warranties of Quality in Non-Sales Cases,* 57 Colum.L.Rev. 653 (1957); Comment, *Sale of Goods in Service-Predominated Transactions,* 37 Fordham L.Rev. 115 (1968). In the latter setting, the Pennsylvania Supreme Court stated in *Hoffman v. Misericordia Hospital,* 439 Pa. 501, 267 A.2d 867, 870 (1970) that it does "not feel obligated to hinge any resolution of the very important issue here raised on the technical existence of a sale." *But see Angell v. Tubies,* 36 Pa.D. & C.3d 41, 45 (1983) (classifying hybrid-transaction based on whether goods or services are the essential element). In our view, the Pennsylvania Supreme Court would respond in the same manner to the question of whether, on the facts of this case, Terminix was a "seller" of goods under section 402A. We think it would agree with one commentator in the UCC warranty setting that "[t]he proposition that there is no sale when goods pass from one person to another in the context of a service-predominated contract is a legal fiction which merely serves to deprive the consumer of needed protection." Comment, *Sale of Goods in Service Predominated Transactions,* 37 Fordham L.Rev. 115, 122 (1968).

Federal courts applying Pennsylvania law have made clear that strict products liability has not been expanded to include persons who provide *only* services. *See, e.g., Klein v. Council of Chemical Associations,* 587 F.Supp. 213, 223 (E.D.Pa.1984); *Kohr v. Johns-Manville Corp.,* 534 F.Supp. 256 (E.D.Pa.1982). But the court in *Lemley v. J & B Tire Co.,* 426 F.Supp. 1378, 1379 (W.D.Pa.1977), predicted in dictum that Pennsylvania would follow New Jersey in holding the supplier of a product in a "hybrid sale-service transaction" strictly liable in tort for defects in the product. We agree,[2] and conclude that plaintiffs may go forward with their claim under section 402A.

## II. *Strict Liability for Ultrahazardous Activities*

■ Count VI of the complaint alleges that "the handling and application of toxic and/or hazardous chemicals by Terminix as part of its exterminating activities constitute ultrahazardous and abnormally dangerous activities." In *Federoff v. Harrison Construction Co.,* 362 Pa. 181, 66 A.2d 817 (1949), the Pennsylvania Supreme Court adopted sections 519 and 520 of the Restatement (Second) of Torts as a basis for strict liability for ultrahazardous activities. We assume that plaintiffs included this count in their complaint as an alternative route to strict liability in the event that Terminix was held not to be a "seller" for purposes of section 402A.

Under section 520, the factors to be considered in determining whether an activity is ultrahazardous or abnormally dangerous include the extent to which the activity is not a matter of common usage and the inappropriateness of the activity for the place where it is performed. Terminix argues that the application of termiticides is a common practice in residences, and cannot be a basis for liability under section 520. The Villaris argue in response that the application of the *particular* termiti-

---

**2.** The rationale for imposing strict product liability upon the supplier of the product in this setting is particularly strong where, as here, the alleged defect is a failure to warn: the product reaches its end user "controlled and supervised

by intermediaries who have access to independent information that is equal to or better than that which may be provided by the original product manufacturer." Epstein, *Modern Products Liability Law* at 115 (1980).

cide used by Terminix *was* unusual, and that Aldrin is dangerous when used in residences.

There is some authority for the proposition that the use of pesticides, however common, is an ultrahazardous activity, although there is also authority to the contrary. *Compare Loe v. Lenhardt*, 227 Or. 242, 362 P.2d 312 (1961) (crop dusting is ultrahazardous) *with Bennett v. Larsen Co.*, 118 Wis.2d 681, 348 N.W.2d 540 (1984) (agricultural use of pesticides is not ultrahazardous). There is also some authority for the proposition that the use of a *particular* pesticide under particular conditions may be ultrahazardous, even if the pesticide is approved for the general *type* of use to which it is put. *Luthringer v. Moore*, 31 Cal.2d 489, 190 P.2d 1 (1948). Nonetheless, we conclude that strict liability for ultrahazardous activities is not applicable to this case.

In general, the Pennsylvania courts have been hesitant to apply section 520 to activities not traditionally within its scope. *See Haddon v. Lotito*, 399 Pa. 521, 161 A.2d 160 (1960) (rejecting application of § 520 to public fireworks display); *Matulevich v. Matulevich*, 345 Pa.Super. 507, 498 A.2d 939, 941 (1985) (rejecting application of § 520 to the handling of firearms). But our concern in this case stems less from the nature of the activity than from the relationship between the parties. Section 520 lists as one of the factors to be considered in determining whether an activity is ultrahazardous "the extent to which its value to the community is outweighed by its dangerous attributes." One of the central purposes of this form of strict liability is to assure that those receiving the benefits of dangerous but essential activities insure against the costs those activities impose on others. *See Albig v. Municipal Authority of Westmoreland County*, 348 Pa.Super. 505, 502 A.2d 658 (1985); *Indiana Harbor Belt R.R. v. American Cyanamid Co.*, 517 F.Supp. 314, 318 (N.D. Ill.1981) ("courts have found it just to impose the loss on the one creating the risk and reaping the profit"). The Villaris have attempted to bring their claim under this theory by asserting that application of Ald-

rin was an activity engaged in by Terminix for its *own* economic benefit, and that the costs of the activity should be borne by Terminix rather than by the Villaris. But this characterization of the transaction is, in our view, unrealistic. Homeowners contract for termite protection in order to reduce damage to, and safeguard the economic value of, their homes. We see no rationale under this theory of liability for requiring a contractor to insure against costs to a homeowner which are caused by an activity requested by that homeowner for the protection of that homeowner's own property. Legal theories that more accurately reflect the relationship between the parties—including strict products liability under section 402A—are, in our view, better suited to the claim at hand.

Terminix's motion for summary judgment shall be granted as to Count VI.

### III. *Nuisance*

The Villaris allege in Count VIII of their complaint that their exposure to termiticides "constitutes a nuisance or a substantial unreasonable interference with their individual use and enjoyment of their property." Upon challenge by Terminix, the Villaris concede that they have not stated, and cannot state, a claim for nuisance. They contend, however, that Count VIII properly states a claim for trespass. Without commenting on the merits of such a claim on these facts, we think it clear that Count VIII cannot be read to include it.

Terminix's motion for summary judgment shall be granted as to Count VIII.

### IV. *Fraud and Fraudulent Misrepresentation*

■ The Villaris allege in Count X of the complaint that Terminix's representation that their residence was habitable as of March 19, 1984 and that the clean-up would be completed after they returned to their home was fraudulent. The Villaris' response to Terminix's summary judgment suggests a broader scope for the fraud claim, going not only to the events leading to their return to the residence but also to

the treatment of the home with Aldrin in October of 1983. In light of the requirement that fraud be plead with specificity, Fed.R.Civ.P. 9, we are not prepared to evaluate the fraud claim on this broader basis.

The elements of fraud under Pennsylvania law are as follows:

> (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result.

*Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285 A.2d 451, 454 (1971). All elements of fraud must be proven by evidence that is clear, precise and convincing. *Snell v. Pennsylvania*, 490 Pa. 277, 416 A.2d 468 (1980).

We agree with Terminix that the Villaris' fraud claim cannot stand. In particular, the Villaris have not presented evidence that would permit a jury reasonably to conclude that the Villaris relied on Terminix's representation that their house was now habitable and that further clean-up would be performed promptly. It appears from the evidence and from arguments of counsel that the Villaris, who were represented by counsel at the time, returned to their home because they were informed that their hotel bills would no longer be paid, and that they arranged for further air sampling to permit them to make an independent assessment of the condition of their home. We see no basis on this record for a finding that the Villaris relied on Terminix's representations or that the Villaris were "lulled into inaction by trick and artifice." *In re Reichert Estate*, 356 Pa. 269, 51 A.2d 615, 618 (1947). Even if such reliance could be demonstrated, the only harm that could be found to flow from that reliance would be exposure to heightened levels of Aldrin in April and May of 1984. Damages from that period of exposure would, in our view, be too speculative to support a claim for fraud under Pennsylvania evidentiary standards. *See generally Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Terminix's motion for summary judgment shall be granted as to Count X.

## V. *Intentional Infliction of Emotional Distress*

■ Count XI of the complaint, like the fraud count, focuses on Terminix's failure to complete the clean-up after the Villaris moved back to their residence. The Villaris allege in Count XI that this conduct constituted intentional infliction of emotional distress.

The Third Circuit has predicted that the Pennsylvania Supreme Court will recognize the tort of intentional infliction of emotional distress as set forth in section 46 of the Restatement (Second) of Torts. *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1274 (3d Cir.1979). "The cause of action has three elements: the conduct must be 'extreme and outrageous,' be 'intentional or reckless,' and cause severe emotional distress." *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 84 (3d Cir. 1987) (quoting *Chuy*, 595 F.2d at 1273). As a general rule, for conduct to form the basis of a claim for intentional infliction of emotional distress, it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 comment d.

Pennsylvania courts have held that a tenant may state a claim for intentional infliction of emotional distress against a landlord who breaches the implied warranty of habitability. *See Fair v. Negley*, 257 Pa. Super. 50, 390 A.2d 240 (1978); *Beasley v. Freedman*, 256 Pa.Super. 208, 389 A.2d 1087 (1978). In *Cautilli v. GAF Corp.*, 531 F.Supp. 71, 75 (E.D.Pa.1982), the court noted that "[l]andlords under Pennsylvania law occupy a special status in their relations with their tenants which imposes upon them special duties and restricts their freedom of action," and predicted that Pennsylvania courts would not "extend the principles of *Fair* and *Beasley* beyond the particular context of landlord-tenant relations"—a prediction which has been borne

out by subsequent developments. But the court also suggested that "independent of the special duties and liabilities appurtenant to the landlord's status ... [c]onduct either causing or tolerating such conditions as vermin and insect infestation and dangerous defects in housing facilities may well establish a plausible basis on which to build a claim for intentional infliction of emotional distress." *Id.* at 75 n. 4. It would not seem too great an expansion of the rationale of the landlord-tenant cases to conclude that plaintiffs might properly state a claim for intentional infliction of emotional distress against one who uses superior economic power to force them to live in a residence which is in a condition dangerous to their health and welfare.

Were this issue before us on a motion to dismiss, we would hold that a proper claim had been stated. But the issue is before us on a motion for summary judgment. On the record before us, we conclude that a jury could not properly find Terminix's conduct in and after March of 1984 sufficiently outrageous, nor the resulting emotional distress suffered by the Villari family sufficiently severe, to support a finding of intentional infliction of emotional distress.

Terminix's motion for summary judgment shall be granted as to Count XI.

## VI. *Punitive Damages*

■ In three counts of their complaint, the Villaris seek punitive damages. Two of these, Count X (fraud) and Count XII (intentional infliction of emotional distress) have been rejected on other grounds. Count IX, captioned "Reckless and Wanton Misconduct," claims punitive damages on the ground that all of Terminix's actions were intentional, wanton, or reckless in their disregard for the rights of the Villaris.

Under *Martin v. Johns-Manville Corp.,* 508 Pa. 154, 494 A.2d 1088, 1097 (1985), a party seeking punitive damages must show not merely that the defendant failed "to

appreciate the degree of risk from a known danger," but that the defendant knew the nature of the risk and deliberately acted in conscious disregard or indifference to that risk. In our view, the record before us might support the former charge, but does not support the latter.

Terminix's motion for summary judgment shall be granted as to Count IX.

## VII. *Damages for Emotional Distress*

■ The Villaris' complaint does not contain a count alleging negligent infliction of emotional distress, but their complaint generally seeks damages for emotional distress due to fear of· the consequences of exposure to hazardous termiticides. The parties have analyzed the claim for emotional distress damages in terms of the tort of negligent infliction of emotional distress, and we shall do the same.[3]

In *Cathcart v. Keene Industrial Insulation,* 324 Pa.Super. 123, 471 A.2d 493 (1984), the court rejected a claim brought by the spouse of an asbestos worker for negligent infliction of emotional distress due to fear of contracting asbestos-related diseases in the future. The court held that no such claim could properly be brought "until [plaintiff] is able to allege some physical injury or some medically-identifiable effect linked to her exposure to asbestos particles." 471 A.2d at 508. Because plaintiff "demonstrated no physical manifestation of disease whatsoever," *id.,* the claim was rejected. Similarly, the Third Circuit in *Wisniewski v. Johns-Manville Corp.,* 759 F.2d 271, 273 (3d Cir.1985) rejected a similar claim because, although plaintiffs alleged that they suffered headaches due to fear of cancer, "no symptoms ... arose directly from their exposure to the asbestos itself." These courts have not required plaintiffs to demonstrate current symptoms of the particular diseases they claim to fear. Rather, they have simply required a demonstration of some physical symptoms due to exposure.[4]

**3.** In doing so, we do not mean to suggest that the Villaris would be entitled to damages for emotional distress on each count in which emotional distress damages are sought.

**4.** In an earlier decision, *Plummer v. United States,* 580 F.2d 72 (3d Cir.1978), prisoners who were exposed to a fellow inmate with tuberculosis were permitted to recover for mental suffer-

As we observed earlier in this memorandum, the Villaris *have* presented evidence that they suffered physical symptoms of exposure to Aldrin in the month after the spill. As a result, we conclude that they may pursue claims for emotional distress damages where such claims are otherwise appropriate.

## VIII. *Costs of Future Medical Monitoring*

■ Paragraph G of the Villaris' request for relief asks this court to "establish a constructive trust in favor of Plaintiffs in an amount sufficient to pay the cost of medical detection and medical monitoring." As the Villaris now recognize, their request for such equitable relief is properly understood as a request for damages for future medical monitoring. *See Peterman v. Techalloy Co., Inc.*, 29 Pa.D. & C.3d 104, 110 (1982).

Under Pennsylvania law, a plaintiff seeking costs of medical surveillance as an element of damages must demonstrate that she has suffered some physical injury. *See Greenberg v. McCabe*, 453 F.Supp. 765, 773 (E.D.Pa.1978), *aff'd mem.*, 594 F.2d 854 (3d Cir.1979); *Peterman, supra,* 29 Pa.D. & C.3d at 110.[5] However, we do not understand Pennsylvania law to require that a plaintiff exhibit symptoms of the particular diseases for which medical surveillance is sought. We have found that there is sufficient medical evidence on record to permit a jury to conclude that the Villaris suffered physical injury from Aldrin exposure in the month following the spill. We conclude that the same evidence supports a claim for the costs of future medical surveillance.[6]

## IX. *Claims of Minor Plaintiffs*

Because the Villaris have presented evidence that their children suffered physical injury due to Aldrin exposure, we reject Terminix's contention that their minor children must be dismissed from this action.

In sum, Terminix's motion for partial summary judgment shall be granted in part and denied in part. An appropriate order is appended.

## ORDER

For the reasons set forth in the accompanying Memorandum, it is hereby ORDERED and DIRECTED that defendant's motion for partial summary judgment is GRANTED IN PART AND DENIED IN PART. Defendant's motion for partial summary judgment is GRANTED as to the following counts and requests for relief:

(1) Count VI (strict liability for the operation of an ultrahazardous activity);

(2) Count VIII (nuisance), and request for relief E (abatement of nuisance);

(3) Count IX (reckless and wanton misconduct), and request for relief B (punitive damages);

(4) Count X (fraud and fraudulent misrepresentation), and request for relief C (punitive damages);

---

ing experienced by reason of their exposure. The prisoners were able to establish their exposure by testing positive on standard tuberculosis tests, but did not exhibit symptoms of the disease.

If the goal of restricting actions for negligent infliction of emotional distress through a requirement of physical corroboration is to require proof of *exposure, Plummer* seems adequate and *Cathcart* more demanding than necessary. If, however, the purpose is to require proof that there is some rational basis for the plaintiff's particular fears, *Cathcart* may not be sufficiently demanding. Although the rationale for drawing the line precisely where *Cathcart* draws it is not entirely clear, we need not, on the facts of this case, determine the continued vitality of the *Plummer* analysis.

**5.** The Villaris urge this court to predict that the Pennsylvania Supreme Court will follow *Ayers v. Township of Jackson,* 189 N.J.Super. 561, 461 A.2d 184 (1983), *vacated on other grounds,* 202 N.J.Super. 106, 493 A.2d 1314 (1985), and hold that the cost of future medical monitoring is a proper element of damages whenever medical testimony establishes the need for future monitoring. The Villaris have offered no basis for this prediction in decided Pennsylvania cases, and we see none.

**6.** At trial, the Villaris will also have to "demonstrate the probability . . . that the treatment will be performed as well as the fact of the injury itself." *Greenberg, supra,* 453 F.Supp. at 773. We are not prepared to take as conclusive against the Villaris that they have not yet established a program of medical monitoring.

(5) Count XI (intentional infliction of emotional distress), and request for relief D (punitive damages).

Defendant's motion for partial summary judgment is DENIED in all other respects.