**Leonard VILLARI and Annette Villari, individually and on Behalf of their minor children Leonard, Marnie, Heidi, Heather, Joshua and Annette Villari**

v.

**TERMINIX INTERNATIONAL, INC.**

**Civ. A. No. 85–1363.**

United States District Court, E.D. Pennsylvania.

Aug. 8, 1988.

Mitchell S. Pinsley, Philadelphia, Pa., for defendant.

Stanley R. Scheiner, David F. Simon, Philadelphia, Pa., for plaintiffs.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

This is a diversity action in which plaintiffs, the Villari family, allege that defendant pest control corporation, Terminix Inc. ("Terminix"), contaminated their home with termiticides. The defendants have submitted several motions in limine relating to the admissibility of certain evidence. This Memorandum addresses each of these motions.

### I. Motion to Exclude Certain Animal Experiments from Evidence on the Issue of the Human Carcinogenicity of Aldrin, Dieldrin, Chlordane & Heptachlor

In the first motion, the defendant seeks to exclude from evidence certain studies, including animal studies, involving defendant's termiticides. Among the studies the defendant seeks to exclude are a recent report by the United States Environmental Protection Agency, entitled "Chlordane, Heptachlor, Aldrin and Dieldrin, Technical Support Document," and a report of the National Academy of Sciences, entitled "An Assessment of the Health Risks of Seven Pesticides Used for Termite Control." The plaintiffs intend to introduce the studies to show that defendant's termiticides are probable human carcinogens. The plaintiffs plan to call two expert witnesses whose testimony at trial will be based, among other things, on these reports.

The defendant argues that the studies constitute "novel scientific evidence" and therefore are subject to the test of admissibility set forth in *United States v. Downing*, 753 F.2d 1224, 1237–41 (3d Cir.1985). In *Downing*, Judge Becker outlined the Third Circuit standard for the admissibility of scientific evidence pursuant to Fed.R. Evid. 702, which governs testimony by experts. Alternatively, the defendant maintains that if the studies are not viewed as novel scientific evidence, they nonetheless should be excluded because their probative value is outweighed by their potential prejudice, Fed.R.Evid. 403, and they do not provide a reliable foundation upon which

the plaintiffs' experts could base their opinions, as required by Fed.R.Evid. 703.

### A. Defendant's Claim that the Studies are Novel Scientific Evidence

■ In a detailed memorandum, the defendant challenges the validity of using animal studies to predict the carcinogenicity of pesticides in humans. In the defendant's view, such studies have disputed value in isolating the effects of individual substances, *see* Defendant's Memorandum in Support of Motion to Exclude Certain Animal Experiments from Evidence, at 26–31 & Appendix "A" (chronicling the difficulties of carcinogenic research with mice), in distinguishing between cancerous and non-cancerous changes in animal subjects, *see id.*, at 31–33, and in relating their findings to human carcinogenicity, *see id.*, at 34–63. Because there is wide disagreement concerning the reliability of particular findings of these studies, the defendant concludes, the evidence must be regarded as novel scientific evidence, and the techniques on which it is based should be reviewed for their soundness.

In making this argument, the defendant confuses disagreements about particular results with disagreements about the processes that generate those results. Only the latter set of disagreements concerns the admissibility of scientific evidence; the former relates to the weight such evidence should be accorded. In *Downing*, the court declared that "[e]vidence that derives from principles and techniques of uncontroverted validity is, of course, readily admissible." 753 F.2d at 1232 (subject to other restrictions not relevant to this case). While it may be true that the defendant can offer tests and experiments that do not support the findings of plaintiffs' experts, the defendant cannot deny that animal studies are routinely relied upon by the scientific community in assessing the carcinogenic effects of chemicals on humans. Even the defendant's own expert acknowledges that animal experiment studies are built on "prudent presumptions," although he concludes that they should not be admitted. *See* Letter of Dr. Gori, Defendant's Memorandum in Support of Motion to Ex-

clude Certain Animal Experiments from Evidence, Exhibit "A", at 6.

It is worthy of mention that counsel for the defendant does not make any reference in his seventy-eight page Memorandum to Judge Stern's letter opinion in *Boltuch v. Terminix*, Civil Action No. 84–3235 (D.N.J. April 16, 1986), which squarely addressed the issue of whether the studies in this case constitute novel scientific evidence. Judge Stern ruled that "both the NAS report and the animal studies derive from well-established scientific principles and techniques, and neither is based on 'novel form of scientific expertise' within the meaning of *United States v. Downing.*" *Id.* at 11. Given that lead counsel for Terminix in the case at bar was one of Terminix's attorneys in *Boltuch*, it is hard to see how the non-reference to *Boltuch* could have been inadvertent.

B. Defendant's Claim that the Studies Should Be Excluded Under Fed.R. Evid. 703 or Fed.R.Evid. 403

*(1) The Admissibility of the Studies Under Fed.R.Evid. 703*

██ The defendant argues that Fed.R. Evid. 703 bars the testimony of plaintiffs' experts on the animal studies. Fed.R.Evid. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The Third Circuit has taken a liberal approach to the introduction of expert testimony by allowing experts to base their opinions on data that is reasonably relied upon by other experts in the field. There is no separate requirement that the court itself find the data to be trustworthy. *See, e.g., In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238 (3d Cir.

1983), *rev'd on other grounds sub nom., Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Both parties have submitted documentation concerning the reliability of the plaintiffs' studies. Defendant's experts cast doubt on the findings of the studies, suggesting that the carcinogenicity of chemicals in animals provides weak inferential support for the dangerousness of those chemicals to humans. In contrast, the plaintiffs refer to numerous U.S. agencies and scientific organizations that routinely rely on animal studies in assessing risks to humans. I find, by the weight of the plaintiffs' submissions, that a substantial portion of the scientific community relies on animal studies of this type in assessing health risks to humans. That some members of the scientific community hold differing views is not enough to exclude evidence under Fed.R.Evid. 703.[1]

Because I am persuaded that the studies are routinely relied upon by members of the relevant scientific community, I will not exclude the studies on the basis of Fed.R. Evid. 703.

*(2) The Admissibility of the Studies Under Fed.R.Evid. 403*

██ The defendant urges that the animal studies, even if found not to be novel scientific evidence, should be excluded because their probative value is outweighed by their potential to overwhelm, mislead, and confuse the jury. The support defendant offers for this position is unpersuasive.

First, the defendant cites *In re: "Agent Orange" Product Liability Litigation*, 597 F.Supp. 740, 781 (E.D.N.Y.1984), *aff'd in part* and *rev'd in part*, 818 F.2d 226 (2d Cir.1987), for the proposition that reports by regulatory agencies are not sufficient to prove causation in private lawsuits. The issue, however, is not whether the reports are alone sufficient to prove causation, but whether they would prejudice a jury's decision of that issue.

---

1. If defendants are able to demonstrate at trial, through cross-examination or other means, that an overriding segment of the scientific commu-nity repudiates the value of the studies, it would be appropriate to seek their exclusion at that time.

As to prejudice, the defendant argues that this court should adopt the reasoning set forth by two other district courts on the admissibility of animal studies. *See* Defendant's Memorandum, at 73–74 (citing *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1241 (E.D.N.Y. 1985); *Lynch v. Merrell–National Laboratories*, 646 F.Supp. 856, 865–67 (D.Mass. 1986), *aff'd* 830 F.2d 1190 (1st Cir 1987)). Neither of these cases, however, purported to establish a general rule that animal studies are inadmissible. As with all questions of admissibility, the court must look closely at the type of evidence presented and the purpose for which its introduced.

In the Agent Orange litigation, Judge Weinstein found the animal experiment studies to be potentially misleading in large part because the plaintiffs' own experts conceded that the studies were of dubious value in determining the effects of Agent Orange on humans. *See* 611 F.Supp. at 1241. In *Lynch*, the plaintiffs' case for the probative value of their animal studies was substantially weakened by the fact that the plaintiff had been exposed only to therapeutic doses of the substance at issue, bendectin. *See* 646 F.Supp., at 866. In contrast, the studies in this case are routinely relied upon by members of the scientific community to render opinions relating to the issue for which they are offered, the carcinogenicity of termiticides. *See* Answers of Plaintiffs to Defendant's Supplemental Set of Interrogatories Addressed for Answer by Dr. G. John DiGregorio, at 4–5 (attached as Exhibit "D" to Plaintiffs' Answer to Defendant's Motion to Exclude Certain Animal Experiments); United States Environmental Protection Agency, "Chlordane, Heptachlor, Aldrin and Dieldrin, Technical Support Document" (attached as Exhibit "C" to same); National Academy of Sciences, "An Assessment of the Health Risks of Seven Pesticides Used for Termite Control" (attached as Exhibit "I" to same).

Because Fed.R.Evid. 403 provides for the exclusion of relevant evidence, it "should be invoked very sparingly" and only when the probative value of the evidence is substantially outweighed by the potential for undue harm. *See, e.g., Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492, 1502 (11th Cir.1985). Upon consideration of defendant's arguments, I am not persuaded that the probative value of the animal experiment studies will be substantially outweighed by their potential prejudice. Furthermore, I believe that counter-argument in court, rather than the exclusion of evidence, offers the more satisfactory means of resolving the dispute over the value of these scientific reports.

Accordingly, the defendant's first motion will be denied.

## II. Motion to Exclude the Testimony & Reports of G. John Digregorio, M.D., Ph.D. and Wendell W. Kilgore, Ph.D.

The plaintiffs intend to call two experts, G. John Digregorio and Wendell W. Kilgore, to offer testimony relating, among other things, to the toxicity of the termiticides to which the plaintiffs were exposed, and to the plaintiffs' risk of future illness as a result of their exposure. Their testimony will rely in part on the animal studies discussed above.

The first basis defendant offers in support of this Motion—that the opinions of plaintiffs' experts are not based upon data reasonably relied upon by other experts in their field—is resolved by the ruling on the motion above.

The additional case support defendant presents for this motion does not alter my view that these animal experiment studies are reasonably and routinely relied upon by other scientists. The defendant cites *Felgenhauer v. Texaco, Inc.*, Slip Op. No. 85–3671 (Dec. 1, 1987) [available on WESTLAW, 1987 WL 26592], in which Judge Ditter rejected as inadmissible testimony by a lone doctor purporting to show a causal relationship between plaintiff's injuries and exposure to certain chemicals. Judge Ditter found that neither the doctor nor "anyone else in the medical or scientific community" had conducted specific studies concerning the relationship between the chemicals and injuries at issue. *Id.* at 4. Clearly, the circumstances surrounding the

testimony in *Felgenhauer* differ substantially from the circumstances here, in which plaintiffs' experts rely on numerous studies that have undertaken precisely the task of demonstrating a causal relationship between exposure to termiticides and the onset of cancer.

The defendant also refers to the decision in *Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir.1987), in which the court found that the plaintiffs' expert's opinion lacked objectivity because he formed his opinion without any scientific literature to support his claim of a causal relationship between plaintiff's symptoms and exposure to defendant's pesticide. Again, the circumstances of this case differ significantly, because the plaintiffs' experts rest their opinions on a wide body of scientific evidence on which experts in this field routinely rely.

The defendant's insistence that three Circuit courts have "unequivocally [sic] held ... animal studies ... unreliable in the scientific community as a predictor of effects in man" is simply unwarranted. Defendant's Memorandum in Support of Motion to Exclude Testimony and Reports, at 15. As pointed out above, the question of whether any *particular* animal study provides the kind of basis on which an expert in the field may reasonably rely requires an examination of the context in which the study is made. Thus, defendant's reference to *Gulf South Insulation v. U.S. Consumer Product Safety Comm'n*, 701 F.2d 1137 (5th Cir.1983), is as inapposite as the references to the Agent Orange litigation and *Lynch*, discussed in Section I, because the court in *Gulf South* relied heavily on the fact that the expert's opinion was based on a single study involving only 240 rats. In contrast, plaintiffs' experts rely on numerous studies involving thousands of subjects as a basis for their contention that defendant's termiticides are probable human carcinogens.

The defendant's second argument to exclude testimony is that Pennsylvania law bars admission of speculative testimony concerning increased risk of future injury. Although defendant concedes that a doctor may offer a prognosis of a person already injured, Defendant's Memorandum, at 20 (citing *Boyle v. Pennsylvania R.R. Co.*, 403 Pa. 614, 170 A.2d 865 (1961)), defendant asserts that plaintiffs have not yet suffered an injury or illness as a result of their alleged exposure to defendant's termiticides. Because plaintiffs do in fact claim to have already sustained health-related injuries, and represent that they will introduce independent evidence in support of that claim, their experts should not be barred from testifying about the medical risks plaintiffs face as a result of those alleged injuries. *See Villari v. Terminix Int'l Inc.*, 663 F.Supp. 727, 735 (E.D.Pa. 1987).

Finally, the defendant contends that Dr. Kilgore may not testify as to the health of the plaintiffs because he is not a medical doctor. This claim is unsupported. While it is true that an expert must demonstrate special competence to present expert testimony, *see, e.g., Aloe Coal Co. v. Clark Equip.*, 816 F.2d 110 (3d Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987), there is no *per se* rule that non-physicians are unqualified to testify about the medical condition of individuals exposed to chemicals. On its face, Dr. Kilgore's resume offers substantial support for the conclusion that Dr. Kilgore possesses sufficient skill, knowledge, and experience in toxicology to render an expert medical judgment. *See* Resume of Dr. Kilgore, Plaintiffs' Answer to Defendant's Motion to Exclude Certain Animal Experiments, Exhibit "A." If defendant wishes to challenge the sufficiency of Dr. Kilgore's credentials, defendant will have the opportunity to cross-examine Dr. Kilgore at trial before a final decision is made on Dr. Kilgore's status as an expert witness.

Accordingly, the defendant's second motion will be denied.

III. *Motion to Preclude the Evidence of Terminix's Discontinuance of the Use of Aldrin, Chlordane and Heptachlor and the Evidence that these Termiticides Are No Longer Distributed in the United States*

The defendant asserts that its voluntary choice to discontinue its use of certain

termiticides constitutes a subsequent remedial measure, evidence of which is inadmissible under Fed.R.Evid. 407. The rule states:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

### A. Evidence of Terminix's Discontinuance of Use

■ The plaintiffs offer a number of arguments for allowing the introduction of evidence relating to the defendant's discontinuance of use. First, plaintiffs contend that the discontinuance was not voluntary, and hence the purposes underlying the exclusion of a defendant's remedial measures are not implicated. Second, plaintiffs argue that their anticipated uses of the evidence are not restricted by Fed.R.Evid. 407, because they do not plan to use the evidence to prove defendant's negligence. Finally, the plaintiffs urge that the motion should not be granted until it is clear that the evidence cannot be introduced for a permissible purpose under Fed.R.Evid. 407, such as to prove feasibility or to impeach defendant's witnesses. These arguments are not persuasive.

The strong policy justification underlying Fed.R.Evid. 407—the concern that permitting the introduction of evidence of remedial measures to show past negligence will deter efforts to remove potential hazards—suggests that any exception to the rule should be crafted carefully so as to not deter possible corrective efforts. *See, e.g., Werner v. Upjohn Co., Inc.,* 628 F.2d 848, 856 (4th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981). This approach is consistent with the Third Circuit's practical reading of Fed.R.Evid. 407, as reflected in its decision to hold the rule applicable to products liability actions based on § 402A of the Restatement (Second) of Torts. *See Josephs v. Harris Corp.,* 677 F.2d 985, 990–91 (3d Cir.1982); *Knight v. Otis Elevator Co.,* 596 F.2d 84, 91–92 (3d Cir.1979). While it is true that the rule is hardly served by excluding evidence of a party acting under compulsion, it is also true that some remedial efforts would be deterred if a party was penalized for acting prior to such compulsion. Thus, the voluntariness of a remedial effort should be presumed absent a clear showing of coercion.

In this case, the defendant discontinued its use of termiticides containing chlordane and heptachlor at the same time that the Environmental Protection Agency was negotiating with Velsicol Chemical Corporation ("Velsicol"), a primary manufacturer of these termiticides, to discontinue their sale. *See* Environmental News, attached to Plaintiffs' Memorandum as Exhibit "G", at 3–4 (describing EPA's review of termiticide uses over the past decade). The defendant was under no legal obligation to discontinue its use of chlordane and heptachlor. Moreover, although the relevant regulatory agencies were contemplating the promulgation of stricter standards, they provided explicitly for the legal use of the termiticides at issue at the time of the defendant's decision. *See* Defendant's Reply Memorandum in Support of Motion to Exclude Evidence of Discontinuance of Use, at 2. Under such circumstances, allowing the plaintiff to introduce evidence of the defendant's discontinuance of use would run counter to the purposes of Fed. R.Evid. 407.

Plaintiffs also argue that Fed.R.Evid. 407 is inapplicable because they do not anticipate introducing evidence of defendant's discontinuance of use to prove negligence. Rather, they plan to introduce the evidence to prove the dangerousness of defendant's termiticides. Terminix's discontinuance of use, however, is not necessarily probative of the dangerousness of the product, and may well be excludable as irrelevant under Fed.R.Evid. 401. *See* C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5282, at 95–96

(1978) (discussing as one rationale underlying Fed.R.Evid. 407 the likelihood that a defendant's later conduct is not probative of the safety of his earlier conduct); *cf. Dine v. Western Exterminating Co.,* Slip Op., Civil Action No. 86–1857 (D.D.C. March, 1988) [available on WESTLAW, 1988 WL 28370] (excluding as irrelevant agreement between EPA and Velsicol to cancel many registered uses of chlordane and heptachlor). In any case, the possibility that jurors would make the forbidden inference that Terminix's discontinuance constitutes an admission of its culpability with respect to its prior use of the termiticides cautions against admitting the testimony.

More importantly, the plaintiffs' assertion that the evidence can be used to show the dangerousness of the product without also implicating negligence on the part of the defendant is dubious. Negligence is certainly related to the dangerousness of the product with which one is dealing. The standard of care appropriate to the disposal of ordinary garbage unquestionably differs from the standard appropriate to the disposal of toxic waste. To the extent plaintiffs prove the dangerousness of the product through evidence of defendant's discontinuance of use, they also support their claim of defendant's negligence. This unavoidable inference suggests that the plaintiffs are in fact using the defendant's subsequent actions to prove negligence, exactly the purpose proscribed by Fed.R.Evid. 407.

Finally, plaintiffs argue that this court should not rule on this motion until it is clear whether the evidence can be used to show feasibility or to impeach defendant's witnesses, two permissible uses for evidence otherwise excludable under Fed.R. Evid. 407. If plaintiffs at some point demonstrate that the evidence can be offered for a purpose consistent with Fed.R.Evid. 407, they may seek to introduce it at that time. At the present time, I rule only that

the evidence constitutes a subsequent remedial effort by Terminix, and that it may not be introduced to support plaintiffs' claim of the dangerousness of the termiticides.

## B. Evidence that the Termiticides are No Longer Distributed in the United States

■ The defendants argue that evidence that the termiticides are no longer distributed in the United States should be excluded either as irrelevant under Fed.R.Evid. 401 or excessively prejudicial under Fed.R. Evid. 403.[2]

Much of the evidence relating to the withdrawal of termiticides from the United States market has been excluded in other litigation. *See Dine v. Western Exterminating Co.,* Slip Op., Civil Action No. 86–1857 (D.D.C. March 18, 1988) (holding that evidence of Velsicol's agreement with the EPA to cancel certain uses of chlordane and heptachlor was not probative of the carcinogenicity of these termiticides); *Rabb v. Orkin Exterminating Co.,* 677 F.Supp. 424 (D.S.C.1987) (upholding exclusion of evidence of the alleged withdrawal of chlordane-based products by Velsicol). The persuasive rationale behind these decisions is that evidence that some companies withdrew certain chemicals from the market, unaccompanied by proof that the companies based their withdrawals on knowledge of the chemicals' dangerousness, is unlikely to have much probative value. Proof of the chemicals' dangerousness requires much more direct evidence. Here, the plaintiffs intend to use expert testimony and animal studies to support their position concerning the carcinogenicity of the termiticides. Whatever additional support might be provided by the evidence that the termiticides are no longer used in the United States is outweighed by the substantial possibility that a jury would draw an unwarranted inference from the evidence.

---

**2.** The defendant seems to concede, correctly, that remedial efforts by non-parties are not excludable via Fed.R.Evid. 407 unless the non-party has a sufficient interest in the litigation such that the introduction of evidence of its remedial efforts may deter its undertaking those efforts. For a discussion of the admissibility of third-party remedial efforts, see Wright & Graham, *supra,* § 5248, at 112–13.

Accordingly, the defendant's Motion to Preclude the Evidence of Terminix's Discontinuance of the Use of Aldrin, Chlordane, and Heptachlor and the Evidence that these Termiticides Are No Longer Distributed in the United States will be granted.

## IV. *Motion to Exclude Evidence on Failure to Warn*

In their complaint, plaintiffs assert that the defendant should be held strictly liable under § 402A of the Restatement (Second) of Torts for its alleged failure to warn of the dangers associated with its termiticides. In this motion, the defendant seeks to exclude evidence relating to its alleged failure to warn. The defendant offers two arguments. First, the defendant claims that it cannot be deemed a seller or distributor of a product in plaintiffs' § 402A strict liability action because the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et. seq.* (1982) ("FIFRA"), provides that a certified applicator who does not deliver any unapplied pesticides should not be viewed as a seller or distributor under the Act. The defendant maintains that Congress intended in this section to insulate certified applicators from strict liability under § 402A. The defendant's second argument is that FIFRA preempts any state law tort claim based on defendant's alleged failure to warn.

### A. The Definition of "Seller" Under FIFRA

■ In ruling on defendant's Motion for Summary Judgment, *Villari v. Terminix Int'l Inc.*, 663 F.Supp. 727 (E.D.Pa.1987), this court found that Pennsylvania would allow the extension of strict products liability to a person who supplied a product in the course of performing a service. That opinion canvassed the sound policy reasons and precedent for allowing a supplier of a product in a "hybrid sale-service transaction" to be held strictly liable for product defects. *See* 663 F.Supp. at 730–31. The defendant now argues that Congress intended to preclude such liability by its language in § 136(e)(1) of FIFRA.

Section 136(e)(1) provides that

[A certified applicator is] any individual who is certified under section 136b of this title as authorized to use or supervise the use of any pesticide which is classified for restricted use. Any applicator who holds or applies registered pesticides, or use dilutions of registered pesticides consistent with subsection (ee) of this section, only to provide a service of controlling pests without delivering any unapplied pesticide to any person so served is not deemed to be a seller or distributor of pesticides under this subchapter.

The defendant contends that if Terminix is viewed as a non-seller under FIFRA, it cannot be viewed as a seller for the purposes of plaintiffs' § 402A action. Accordingly, defendant argues, the plaintiffs' strict liability action must fail, because liability under § 402A attaches only to those who have sold a product. *See* Defendant's Memorandum, at 8 (citing *Kohr v. Johns–Manville Corp.*, 534 F.Supp. 256 (E.D.Pa. 1982)).

Although § 136(e)(1) does express Congress's intent to treat certain individuals who apply pesticides as non-sellers, it is apparent from other passages in § 136 that Terminix is not an individual within the meaning of the Act. Hence, FIFRA does not preclude plaintiffs' strict products liability action based on Terminix's alleged failure to warn.

The Act refers in various sections to both "persons" and "individuals." The drafters' decision to use one of the terms rather than the other, so as to indicate whether a requirement extends to a single individual or to a business, is deliberate throughout the statute. For example, § 136b, which governs the certification procedure, provides in pertinent part that

In any State in which the Administrator conducts a certification program, the Administrator may require any *person* engaging in the commercial application sale, offering for sale, holding for sale, or distribution of any pesticide one or

more uses of which have been classified for restricted use to maintain such records

... as the Administrator may by regulation prescribe.... Such standards shall provide that to be certified, an *individual* must be determined to be competent with respect to the use and handling of pesticides.... (emphasis added)

In addition, "person" is defined in § 136 of the Act as "any individual, partnership, association, corporation, or any organized group of persons whether incorporated or not." Given this definition of "person," Congress seems to have intended that the term "individual," as used in § 136(e)(1), should retain its ordinary meaning. Thus, § 136(e)(1) reflects an intent to protect "individual[s]," and not entities such as Terminix, from liability as "seller[s] or distributor[s] of pesticides."

Moreover, as the plaintiffs point out in their brief, Terminix's role in this case was far greater than that of a licensed applicator of termiticides. Terminix served as the seller, distributor, and applicator of the termiticides used in the plaintiffs' home.

Thus, neither the language of § 136(e)(1) nor the law of Pennsylvania prevents Terminix from being viewed as a seller for the purposes of plaintiffs' § 402A strict liability action.

**B. Defendant's Claim that Plaintiffs' State Law Tort Action for Failure to Warn is Preempted by FIFRA**

■ The defendant contends that § 136v reveals Congress's intention to preempt state law tort actions against pesticide companies based on inadequate warnings. Section 136v allows for state regulation of the sale or use of federally registered pesticides but proscribes state imposition of labeling or packaging requirements that add to or differ from those required by the Act. The section reads, in pertinent part:

(a) A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

Congress may preempt state law through either express language or implication. *See, e.g., Cipollone v. Liggett Group, Inc.*, 789 F.2d 181 (3d Cir.1986), *cert. denied*, 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987). A court may find that Congress has implicitly preempted state law either because Congress has manifested an intent "to occupy a field" or because an actual conflict arises between the state and federal regulation. *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). There is a presumption that "Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981).

It is clear from § 136v that FIFRA contemplates a regulatory role for states in the area of pesticides. The only question is whether plaintiffs' claim based on defendant's alleged failure to warn falls within the range of permissible state regulation or conflicts with FIFRA's prohibition of state labeling and packaging requirements.

The defendant argues that this court should follow the reasoning of *Fitzgerald v. Mallinckrodt, Inc.*, 681 F.Supp. 404 (E.D.Mich.1987), a recent decision which found that FIFRA preempted a state law cause of action based on the alleged inadequacy of the defendant's warning labels. The plaintiff in *Fitzgerald* maintained that if "the warning labels been prepared differently he would not have been injured in the same manner." The nature of the plaintiff's claim in *Fitzgerald* differs significantly, however, from the plaintiffs' claim in this case.

The plaintiffs do not assert that their injuries were the result of the defendant's failure to comply with federal regulations regarding the labeling and packaging of defendant's pesticides. Rather, their claim is that the defendant had an obligation, under state common law, to ensure that an appropriate warning reached not only the employees who handled the pesticides, but

also the plaintiffs themselves, as the ultimate consumers of the pesticides. *See* Plaintiffs' Response to Defendant's Motion, at 8 (citing *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121, 131 (9th Cir.1968)).

Recognition of this "failure-to-warn" claim does not conflict with FIFRA's prohibition of state labeling or packaging requirements because the defendant's liability is unrelated to the manner in which the product is labeled or packaged. Under plaintiffs' theory, liability attaches as a result of defendant's failure to *relay* the warning that FIFRA requires sellers to affix to their product.[3]

In addition, the plaintiffs' contention that their failure-to-warn claim does not conflict with FIFRA is strengthened by the fact that their claim encompasses events subsequent to the defendant's application of termiticides in their home. The plaintiffs maintain that the defendant had a duty to inform them of any health risks posed by the termiticide spill in their basement. This claim in no way involves the federally-mandated labeling and packaging requirements of FIFRA.

Finally, the obvious purpose underlying FIFRA's prohibition of state labeling and packaging requirements—that non-uniform requirements by states would burden interstate trade of pesticides—is not undermined by the plaintiffs' failure-to-warn claim. Success by the plaintiffs would provide no incentive to the defendant or any other seller of termiticides to alter its labeling or packaging. Rather, such success should, as its only effect, encourage compliance with state regulations concerning the sale and use of pesticides, a result wholly consistent with § 136 of FIFRA.

Accordingly, defendant's Motion to Exclude Evidence on Failure to Warn will be denied.

### ORDER

For the reasons stated in the accompanying Memorandum, it is ORDERED that:

---

**3.** The defendant argues that because the product used in plaintiffs' home was a diluted version of the termiticide regulated under FIFRA, no warning need have been given to the plaintiffs.

1. Defendant's Motion to Exclude Certain Animal Experiments from Evidence on the Issue of the Human Carcinogenicity of Aldrin, Dieldrin, Chlordane & Heptachlor is DENIED;

2. Defendant's Motion to Exclude the Testimony & Reports of G. John Digregorio, M.D., Ph.D. and Wendell W. Kilgore, Ph.D. is DENIED;

3. Defendant's Motion to Preclude the Evidence of Terminix's Discontinuance of the Use of Aldrin, Chlordane and Heptachlor and the Evidence that these Termiticides are No Longer Distributed in the United States is GRANTED;

4. Defendant's Motion to Exclude Evidence on Failure to Warn is DENIED.

This argument, however, goes to the merits of the plaintiffs' claim and not to whether that claim is preempted by FIFRA.