James E. STRAUSS, Plaintiff,

v.

Richard SPRINGER, and Robert Clift,
and the City of Philadelphia,
Defendants.

Civ. A. No. 91–439.

United States District Court,
E.D. Pennsylvania.

Nov. 13, 1992.

David F. Michelman, N. Marlene Fleming, Blackburn & Michelman, P.C., Joseph McGill, Philadelphia, PA, for plaintiff.

David Garcia–Villarreal, Chief Asst. City Solicitor, Philadelphia, PA, for defendants.

## MEMORANDUM

LEOMPORRA, Chief United States Magistrate Judge.

### PROCEDURAL HISTORY

On January 22, 1991, plaintiff, James E. Strauss, filed a civil rights action under 42 U.S.C. § 1983[1] against Philadelphia Police Officers Richard Springer and Robert Clift and the City of Philadelphia, alleging excessive use of force by the officers against him. Plaintiff contended that the City was in violation of the statute since it had a custom, usage, or policy in failing to properly train its officers resulting in their use of unconstitutional police methods. The suit arose from an incident[2] which occurred in the early morning hours of August 28, 1989, at an Acme Warehouse at 31st and Thompson Streets in Philadelphia, where a series of gunshots were fired by the defendant officers at the plaintiff, one of which struck him in the hip area. Plaintiff sought damages under the civil rights statute and also brought pendent state causes of action for assault and battery and negligence against the defendants.[3]

Defendants filed a Motion for Partial Summary Judgment on April 9, 1992 to dismiss the negligence claims against them. In a Memorandum and Order dated May 18, 1992, I denied this motion.

Trial commenced before a jury on June 9, 1992. Just prior to the start of the proceedings, defendants filed a Motion in Limine seeking to have specific documents and expert opinion on these documents excluded from being offered as evidence during the trial.[4] At the close of plaintiff's case, the defendants motioned for a directed verdict pursuant to Fed.R.Civ.P. 50 (N.T. 6/17/92 at p. 146). This motion was denied and the defendants presented their case. At the conclusion of their case, they again motioned for a directed verdict which was also denied (N.T. 6/18/92 at 11, 18).[5]

Due to the complexity of the case and the numerous issues to be considered, the jury was given special interrogatories[6] to be answered during its deliberations and returned to the court as its verdict. On June 19, 1992, the jury came back with the following verdict:

---

1. Section 1983 provides, in pertinent part, as follows:

 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....
 42 U.S.C. § 1983.

2. A more detailed account of the plaintiff's and the defendants' versions of the incident will be discussed *infra*.

3. In plaintiff's original complaint, he also asserted claims under 42 U.S.C. §§ 1985 and 1988, abuse of process, and false imprisonment. However, by mutual agreement of the parties, these charges were withdrawn prior to trial.

4. I ruled on this motion during the course of the trial. My rulings are one of the issues raised by plaintiff in this current Motion for Partial New Trial and will be discussed later in the body of this Memorandum.

5. Plaintiff was represented at trial by Joseph McGill, Esquire, who tried the case and co-counsel, N. Marlene Fleming, Esquire, who argued several motions. The defendants were represented by David Garcia–Villarreal, Esquire, of the Philadelphia City Solicitor's Office.

6. A copy of the jury's answers to these interrogatories is attached to this Memorandum as Appendix "A".

1. Officers Richard Springer and Robert Clift violated plaintiff's constitutional rights under § 1983 by using excessive force;

2. The City of Philadelphia did not have a custom, policy, or regulation which deprived plaintiff of his constitutional rights under § 1983;

3. Officers Springer and Clift did not commit an assault and battery upon the plaintiff on August 28, 1989;

4. Officers Springer and Clift were 40% negligent in their actions on the night in question;

5. Plaintiff, James Strauss, was found 60% contributorily negligent;

6. The City of Philadelphia was responsible for the negligence of their officers;

7. Under Pennsylvania comparative negligence law, the percentage of negligence attributable to the officers was found to be 40%, and the percentage of negligence attributable to the plaintiff was assessed at 60%, thereby foreclosing any recovery for the plaintiff for negligence against the officers or the City;

8. Officers Springer and Clift's actions were not done wilfully, maliciously, wantonly with reckless disregard for the plaintiff's constitutional rights and no punitive damages were awarded;

9. Damages were awarded against the City of Philadelphia only in the amount of $5,260.11 for past medical expenses, $2,500.00 for future medical expenses, and $4,000.00 for past loss of earnings, totalling $11,760.11;

10. No damages were awarded against Officers Springer and Clift.

The verdict was entered on July 1, 1992. On July 16, 1992, plaintiff filed this instant Motion for a Partial New Trial under Fed. R.Civ.P. 59 and raised these contentions in support of his motion:

1. A partial new trial against defendants Officers Springer and Clift, limited to damages alone, should be granted on the grounds that the jury verdict:

(a) was inadequate in that no damages were awarded against the officers,

(b) was against the clear weight of the evidence and inconsistent to the verdict of liability under § 1983, and

(c) would result in a miscarriage of justice.

2. A partial new trial should be awarded against defendant City of Philadelphia on all issues of liability under 42 U.S.C. § 1983 and damages, based on the grounds that the court made substantial mistakes or errors of law in rejecting plaintiff's evidence, and that the exclusion of such evidence was an abuse of discretion. The errors of law are as follows:

(a) the court improperly excluded relevant and admissible testimony from plaintiff's police expert, Dr. James Fyfe, as to the basis for his expert opinion regarding police practices and procedures in the City of Philadelphia; and

(b) the court improperly restricted Dr. Fyfe's testimony and prevented him from giving full and complete expert testimony regarding police practices and procedures in the City of Philadelphia and practice of the City of Philadelphia, by requiring that he be asked questions relating to his expert opinions only in the form of hypothetical questions.

Defendants filed their response on August 3, 1992. Arguments were heard on the motion at a hearing held on September 2, 1992. Plaintiff filed a supplemental brief in support of his motion on September 18, 1992. For the reasons discussed *infra*, plaintiff's Motion for a Partial New Trial is denied.

### STANDARD OF REVIEW

Rule 59(a) of the Federal Rules of Civil Procedure provides, in part, that:

A new trial may be granted to all or any of the parties and on all or part of the issues (1) in any action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States....

Fed.R.Civ.P. 59(a).

The decision to grant or deny a new trial is committed to the sound discretion of the

district court. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980); *Shanno v. Magee Indus. Enterprises, Inc.*, 856 F.2d 562 (3d Cir.1988); *Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 752 F.2d 802 (3d Cir.1984). A court may order a new trial if the verdict was against the weight of the evidence (i.e., if the jury's award was grossly excessive or inadequate), if counsel engaged in improper conduct that had a prejudicial effect upon the jury, or if the court committed a significant error of law to the prejudice of the moving party. *Maylie v. National Railroad Passenger Corp.*, 791 F.Supp. 477 (E.D.Pa.1992); see *Stainton v. Tarantino*, 637 F.Supp. 1051, 1078 (E.D.Pa.1986). However, granting new trials because the verdict is against the weight of the evidence is proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict on the record cries out to be overturned or shocks the conscience. *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344 (3d Cir.1991); *EEOC v. Delaware Dept. of Health*, 865 F.2d 1408, 1413 (3d Cir.1989); *Roebuck v. Drexel University*, 852 F.2d 715, 736 (3d Cir.1988).

## MERITS

### I. THE VERDICT

A. *The verdict is inadequate.*

■ Plaintiff first argues that he is entitled to a partial new trial on the issue of damages alone since the jury found that Officers Springer and Clift violated his civil rights by using excessive force against him, yet awarded him no damages against them.

Plaintiff states in his brief at page 4 [7] that the court properly instructed the jury as to the law under § 1983 and the elements of damages if they found liability on this issue. Plaintiff argues that once the jury found liability, it was required by the court's instructions to consider the elements of damages identified by the court and that the jury's statement that damages against the officers were not applicable (N/A) shows that they did not understand and failed to follow

and/or disregarded the court's instructions, so that they did not consider these elements of damages at all. Plaintiff further asserts that by contrast when the jury found that the evidence did not support a particular type of damage against the City, it entered a zero, and that if it had followed the court's instructions on damages against the officers and concluded that such damages were unsupported by the record, they would have similarly entered $0.00 on each line of the interrogatories for each element of damages against Officers Springer and Clift instead of writing "N/A".

"Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment, ... and the Seventh Amendment requires that if there is a view of the case which makes the jury's answers consistent, the court must adopt that view and enter judgment accordingly." *Atlantic & Gulf Stevedores v. Ellerman Lines*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798, 806–807 (1962); *Griffin v. Matherne*, 471 F.2d 911 (5th Cir.1973).

The test to be applied in reconciling conflicts between the jury's answers is whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted. *Anastasio v. Schering Corp.*, 838 F.2d 701 (3d Cir.1988); *Griffin v. Matherne, supra; United States v. 0.78 Acres of Land, More or Less, et al.*, 81 F.R.D. 618 (E.D.Pa.1979). The Third Circuit added in *Anastasio* at 710, *citing Gallick v. Baltimore & Ohio R.R.*, 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963), that "it is the duty of a court to attempt to harmonize the jury's answers, if that is possible, and give them a fair reading."

My reading of the jury's verdict in this case is completely contrary to that proposed by the plaintiff. After hearing all of the evidence at trial and further reviewing the record and the jury's answers to the special interrogatories, I believe that the jury listened to the testimony and evidence pro-

---

**7.** Referring to plaintiff's brief in support of his Motion for a Partial New Trial.

duced at trial, followed my instructions, and carefully considered each interrogatory and made decisions based on the evidence not to award damages against the individual officers, but only against the City.

At trial, the jury heard two (2) conflicting stories about what happened on the night in question and other conflicting expert testimony. A review of some of the testimony produced at trial, as outlined below, indicates that they had very difficult decisions to make, and that their answers to the interrogatories not awarding damages against the officers, after finding that they had used excessive force against the plaintiff, was logical and consistent with their other findings.

Plaintiff, James Strauss, testified at the trial about the incident which occurred in the early morning hours of August 28, 1989. He stated that he was working for North South Trucklines and drove a tractor trailer of orange juice from Allentown, Pennsylvania, to an Acme Warehouse located at 31st and Thompson Streets in Philadelphia. He was wearing a licensed handgun in a holster on his hip because of fears of robberies and assaults in the neighborhood. Upon arrival, he pulled his truck up along the curb on Thompson Street next to the Acme, exited the truck, and walked to the Acme security guard shack located approximately at the corner of 31st and Thompson Streets. There, a security guard told him to get the license plate number from his truck. He walked back to the rear of his truck and was looking down at the license plate when a "car pulls up, two guys jump out and they yell the word, 'halt.'" Plaintiff stated further that:

"Now, you got to think of this though, it is beyond 2:00 a.m. in the morning in, what I was told, the worst part of Philadelphia. Well, I wanted to say something and it's like, I was baffled, I was shocked. Considering that they did not say nothing further than that, I figured to myself, I'm getting out of here.

8. On cross-examination, plaintiff testified that he ran with the gun because it impeded his running and that as he ran, his arms pumped back and forth as a runner's would (N.T. 6/10/92, at p. 87). Plaintiff also stated that he was left-handed and the gun was in a right handed holster.

So, I started to run east on Thompson Street. I heard at least one gun fire between the rear to the cab of the truck. Between the cab of the truck to the corner of 31st and Thompson Streets is when I have heard the second shot."

(N.T. 6/9/92 at 99–101). Plaintiff testified that at this point he turned the corner and his holstered gun was banging and flopping in his way as he was trying to run, so he unholstered the gun and held it in his hand pointing it down towards the ground.[8] He then rounded the corner; he looked over his left shoulder, didn't see anything, and kept running.[9] Next, he ran "catty-corner across 31st Street into the first overhead garage because he knew there was a steel cage there. He entered the steel cage, slammed the door behind him, went up a ramp and tried a door at the top, but it was locked. He came back down some steps and he put his gun back into his holster and thought to himself "I'm had". He "pranced" a couple of times back and forth in the cage and when he turned around, he saw the man who had been chasing him. He yelled "halt".[10] And then the second guy came at that time and both said, "halt, police," then almost immediately said "put down your gun" (N.T. 6/9/92 at 101–102).

Plaintiff testified that it was then that he first realized that they were police officers. Knowing this, he unholstered his gun, slowly bent down and put the gun on the ground. He then heard something from the officers that he described as "pulled the handle back on their gun, took the safety off or done something. Exactly what it is I don't recall." At this point, he believed he was in trouble so he turned and curled up into a ball with his hands up over his face. He testified that the officers then opened fire with several shots (N.T. 6/9/92 at 102–103). He was hit by one shot and the officers came in, handcuffed him, pushed him into the ground,

9. Plaintiff indicated on cross-examination that he couldn't recall if he ever pointed his gun in the officer's direction.

10. Plaintiff testified on cross-examination that the person said "halt, please" (N.T. 6/10/92, at p. 90).

started to slam his face several times against a steel step, and kicked him several times (N.T. 6/9/92 at 112). It is plaintiff's contention that the shooting at the cage occurred after he put down his gun.

Defendant, Officer Richard Springer, testified at trial and gave his version of the incident with some very significant differences from the plaintiff's testimony. He testified that on the night of August 28, 1992, he and Officer Robert Clift were in plain clothes in an unmarked car at the corner of 31st and Thompson Streets surveying the Acme Warehouse for possible cargo thefts (N.T. 6/16/92 at 92). Officer Springer stated that at this time a person came up to their car and said that there was a white guy with a gun down on Thompson Street. They went down Thompson to investigate and pulled up behind a truck. He saw the plaintiff and got out of the car empty handed and said to Strauss, "police." "He [Strauss] took one look at me and ran. I'm as surprised as he is." According to Officer Springer, plaintiff was on the sidewalk running. He hollered at him a couple of times, "police, halt, stop", but he didn't stop. "Now as he is running I see he is pulling a gun, a very shiny, big gun, which happened to be a .357 Magnum. And I holler at him now, police, halt, drop the gun and I take after him" (N.T. 6/16/92 at 125–126).

Officer Springer testified that at the corner of 31st and Thompson Streets, Strauss stopped and turned on him. He quickly fired two shots "because I'm looking down at a gun pointed my way. I'm looking at a big .357 Magnum pointed in my direction, sir. I don't want to get shot." Officer Springer added that Strauss had made almost a complete turn at a definite stop, although he didn't know if he turned his feet. He said, "I do know he turned the gun around on me. It was pointed in my direction" (N.T. 6/16/92 at 133–139). Officer Springer continued to run after Strauss after he turned onto 31st Street. He testified that he was just steps behind him when Strauss entered the gate area. He stopped at the end of the guard shack which is a concrete wall, saw Strauss on the second or third step and he's "hollering at him, police drop the gun." At this

point, Officer Clift arrived and positioned himself several feet to his left. "I'm still hollering at Mr. Strauss, identifying myself, police officer, drop the gun. Mr. Strauss in turn turns—he is turned around and does not drop the gun. He's pointing the gun down in our direction. I fire a couple of shots, there's more shots fired. The gun finally leaves his hand, falls on the first or second step. We go in and put him under arrest. He was handcuffed". (N.T. 6/16/92 at 141–142). Officer Springer added that the plaintiff's head probably was held against the metal step, but at no time did he hit, punch or kick him (N.T. 6/16/92 at 157–158).

Defendant, Officer Robert Clift, testified at the trial that he drove the car to the back of a truck on Thompson Street after receiving information about a man with a gun. As he and Officer Springer were getting out of the car, Springer immediately said "police". No weapons were drawn. He then saw Officer Springer starting to run. He jumped back in the car and had to back it up the street to catch Springer who had left his car door open. As he was backing up, he could hear Springer yelling, "police, halt, police, halt". He then saw Strauss' gun when he neared the end of Thompson Street. "It was up in the air." He caught up to Springer at the warehouse cage area, exited his vehicle, drew his weapon and came on an angle to Springer's side. At this time, he suddenly caught sight, out of his left eye, of the plaintiff with his gun pointing down toward them. He reiterated that when he saw the plaintiff aiming back at them, pointing at them, that's when he fired. He fired five (5) times, saw Strauss flinch, lean forward and drop the gun. As soon as the weapon hit the ground, they started yelling "get away from the gun." Officer Clift also testified that he did not hit or kick the plaintiff (N.T. 6/16/92 at 191–199).

In addition to this testimony, both plaintiff and defendants presented at the trial much more conflicting evidence for the jury to consider. Plaintiff offered testimony of Dr. James Fyfe as an expert in police administration regarding the use of force by police officers, police firearm discharges, plainclothes duty police conduct and in general training of police officers. Dr. Fyfe testified

step by step through the incident that Officers Springer and Strauss several times violated standard police procedure and their conduct was a direct cause of plaintiff's injuries (N.T. 6/17/92 at 6–139). However, the defendants presented their own expert, Louis Reiter, as an expert in the same area. He testified that all of the actions taken by the police in their handling of this situation was proper, if you believe that Strauss had pointed his gun at the officers and they were in imminent fear of being shot or killed.[11]

It is apparent from this testimony that the jury heard varying testimony on critical points in the case and that the evidence certainly wasn't overwhelming for either side. The jury had to weigh the credibility of the parties, the witnesses, and the expert witnesses in making difficult decisions as to who was at fault, whether both parties were equally at fault, or was one party more at fault than the other for this unfortunate incident.[12]

As stated above, the "Seventh Amendment requires that if there is a view of the case which makes the jury's answers consistent, the court must adopt that view...." *Atlantic & Gulf Stevedores v. Ellerman Lines, supra.* After review of the jury's interrogatories with the above outlined conflicting evidence as a background, it is not difficult for me to see a view of the jury's answers to the interrogatory not awarding damages against the individual officers and indicating "not applicable" as being both logical and consistent with the rest of their answers to the other interrogatories. *See also, Anastasio v. Schering Corp., supra.*

It is apparent from their verdict that they found that both Officers Springer and Clift used excessive force at one time or another during the incident as it occurred, however, it is clear that they believed that the plaintiff was more to blame for what happened to him than the officers since they found the officers to be only forty percent (40%) negligent and the plaintiff sixty percent (60%) negligent. They also found that the officers did not commit an assault and battery against the plaintiff and did not act wilfully, maliciously, or with wanton disregard for plaintiff's constitutional rights. Since the jury found the

11. There was also other conflicting testimony offered at the trial. Plaintiff's witness, Paul Minter, a security guard at the Acme Warehouse, testified that he saw plaintiff at the back of his truck when a car pulled up and two guys got out. He heard two (2) shots fired and didn't know they were police. He also testified that he did not see plaintiff turn around with his gun and point it at anybody. At the cage area, he saw the first officer run up and started shooting at him inside, but he couldn't see inside the cage area (N.T. 6/10/92 at 121–123). The parties stipulated to the testimony of a witness, Lonnie Watson. He worked as a "lumper" at the Acme Warehouse. It was explained that a "lumper" is a *person not employed by the trucking company* who helps truck drivers unload their trucks for pay. The stipulated testimony was that on this night he sought work from Strauss, but was denied. He noticed a gun in a holster worn by Strauss and informed two plainclothes police officers that there was a man with a gun by the parked tractor trailer. They stopped, exited the car and Strauss ran. One officer shot twice as Strauss rounded the corner. He heard the policeman running after him shout, "stop, police". The other drove after him in pursuit. At no time did Strauss turn and point his weapon at the police. At the docking area, he heard about seven (7) shots fired (N.T. 6/11/92 at 88–89). David Brooks, another lumper, testified that he was standing at the corner of 31st and Thompson

when he saw Lonnie Watson ask for work, but Strauss said no. He later saw plaintiff running up Thompson Street and heard two (2) shots fired. Brooks stated further that the plaintiff didn't point the gun at the officers but was holding the holster. He next heard several shots at the warehouse (N.T. 6/11/92 at 90–105). A review of this testimony indicates several inconsistencies. One witness heard the officers yell, "halt police" and another didn't hear it. None of the witnesses saw plaintiff turn and point his gun at Officer Springer, but Brooks saw him holding his holster. This conflicts with plaintiff's own testimony that he did unholster his gun and ran with it in a running motion, pumping his arms. He also testified that he did turn and look back over his shoulder, but couldn't recall if he ever pointed the gun at Springer (N.T. 6/9/92 at 101–102, 6/10/92 at 87). In addition, none of the witnesses saw what happened inside the caged area where plaintiff was shot.

12. One of plaintiff's arguments is that by indicating "N/A" (not applicable) to the officers' damage interrogatory, instead of writing "zero", the jury was confused or failed to follow my instructions. I, however, read the term "N/A" as clearly meaning that the jury believed that the officers should not be responsible for any damages awarded, and that the City was to pay the damages of the officers because the money damages were placed in the bank under the City.

plaintiff more at fault than the officers, it was a consistent answer not to award damages against them. Apparently, they felt that plaintiff was entitled to some damages, but didn't want the officers to pay, but wanted the City to pay the damages.[13] Under the applicable law, I find these answers consistent and must adopt the jury's decision.[14] Thus, under F.R.Civ.P. 59(a), I cannot grant a new trial on this basis.[15]

**B.** *The verdict is against the weight of the evidence.*

■ Plaintiff next argues that there is overwhelming evidence in the record which supported an award of damages for each of the elements of damages specified in the court's instructions and verdict interrogatories and that despite this evidence no damages were awarded against Officers Springer and Clift.

■ Credibility of witnesses and the weight to be given their testimony is for the jury, which may exercise its independent judgment, even if such testimony is uncontradicted. *Rhoades, Incorporated v. U.S. Air Lines, Inc.,* 340 F.2d 481 (3d Cir.1965). In addition, the determination of compensatory damages is within the province of the jury and is entitled to great deference. *Spence v. Board of Education of Christina School Dist.,* 806 F.2d 1198, 1204 (3d Cir.1986); *Wooley v. Great Atlantic & Pacific Tea Company,* 281 F.2d 78 (3d Cir.1960); *Mainelli v. Haberstroh,* 237 F.Supp. 190 (M.D.Pa.1964).

As I discussed in detail above, the evidence as to liability against the defendant officers was clearly not overwhelming and not against the weight of the evidence. In addition, the record indicates that the evidence presented by the plaintiff concerning the amount of and type of damages suffered by him was not overwhelming and a finding of no damages against the officers is again not against the weight of the evidence.

The jury awarded no individual damages against the individual officers, yet found the City liable for the officers' negligence and awarded damages against the City of Philadelphia only. They awarded $5,260.11 for past medical expenses, $2,500.00 for future medical expenses, $4,000.00 for past loss of

---

**13.** It must be noted that prior to closing arguments, I held a lengthy charging conference in which the lawyers were encouraged to offer suggestions and/or additions or subtractions to the charge. After some discussion, I indicated what charge would be read to the jury, although Mr. McGill was of the opinion that the interrogatories were too long and complicated. At the conclusion of this conference there were no objections to any of my charges by either party (N.T. 6/18/92 at 19–56), or to the interrogatories.

**14.** As to the damage interrogatory, (No. 20) being confusing, it was defendants' counsel, Mr. Garcia–Villarreal, who raised a concern that with three (3) defendants and three (3) lines as to each element of damages, the jury might find triple damages by awarding damages against each defendant. However, McGill was totally satisfied with this interrogatory and didn't consider it at all confusing (N.T. 6/19/92 at 35–37). In fact, he countered counsel's argument by stating:

McGILL: Your Honor, I would disagree with that.

I think you resolved it, all of you resolved it by a total figure. I mean, you're not going to be— you're not going to be compensated in triplicate because the total figure will prevent that. (N.T. 6/19/92 at 36).

It must also be noted that no objections by plaintiff were made to the interrogatories at the con-

clusion of my jury charge (N.T. 6/19/92 at 33–37).

**15.** I also gave an instruction to the jury that they were receiving interrogatories and explained to them how important it was that they carefully consider and answer each question.

This instruction stated in part:
... I have prepared interrogatories, questions, and this will lead you along the way in making your decision. I'll give you an original and a copy so that you can have a rough draft to work on and then make a final decision on your final copy....

Now, I want you to go through this carefully, there are a lot of questions. When you do it, take your time and follow the instructions we have tried to make as understandable as possible. And you'll run into—I shouldn't say run into, but you'll be concerned because you'll hear questions, if you answered "no" to Question 1, do not go to Question 2, go to Question No. 3. It's not a game, it's a serious problem that we have in order to get the right answers and it will help you out if you just follow along with these interrogatories, and there are a good many of them. Don't rush into it, take your time. I'll give you an extra copy and you should be able to do it.

We have gone over them carefully, all of us have gone over them carefully. I have received some suggestions from counsel, we have tried our best to conform with those suggestions....

earnings, and zero for future loss of earnings, past pain and suffering, and future pain and suffering, totalling $11,760.11.

In this action, the plaintiff sought a damage award much higher than this total dollar amount, yet it is apparent from the record that the jury heard conflicting testimony as to damages, and was justified in awarding the type and amount of damages that it did.[16]

As to past and future pain and suffering, and past and future medical expenses, plaintiff testified that after the incident, he was taken to Hahnemann University Hospital where he stayed for five (5) days. He was treated there by a Dr. Thomas Gaines. No surgery was performed on him to remove bullet fragments and he didn't recall if he received any painkillers during his stay (N.T. 6/10/92 at 13–14, 71). After discharge he saw Dr. Gaines one (1) or two (2) more times and then went to a Dr. Michael Rhodes in Allentown since he was closer to his home. He testified that he had outpatient surgery by Dr. Rhodes, in which he was conscious, to remove a bullet fragment. He added that some fragments remain in his buttock and he has seen Dr. Rhodes approximately six (6) times to the present. He also stated that neither Dr. Rhodes nor Dr. Gaines ever recommended physical therapy for him (N.T. 6/10/92 at 15, 73). On video testimony, Dr. Rhodes testified that plaintiff had a bump on the left side of his buttock which were bullet fragments. He performed minor surgery using novocaine as a painkiller to remove the fragments. He further indicated that the bullet hit only soft tissue and did not hit any major tissue or bone.

Plaintiff testified further that he has pain in his leg with weather changes that comes and goes, has trouble sleeping on his left side, and has pain upon prolonged sitting, standing and bending. According to the plaintiff, he is limited in doing certain activities like dancing, bike riding and jogging and that he has pain trying to use a clutch in a tractor trailer and thus he cannot drive such a vehicle (N.T. 6/10/92 at 16–19, 67, 74). However, plaintiff also didn't recall if his doctors had ever told him that his activities would have to be limited and that he didn't know if his left leg was weaker than the right.

It is apparent that this evidence was not overwhelmingly in favor of the plaintiff and the jury's award for pain and suffering and past and future medical expenses was not against the weight of the evidence. There is no doubt that plaintiff suffered a bullet wound in the left buttock area. However, he didn't recall receiving painkillers at the hospital, only received minor surgery in having the fragments removed and the medical records and testimony don't support plaintiff's pain allegations. Thus, the jury weighed this testimony and awarded plaintiff only his past medical expenses and $2,500.00 for future medical expenses, apparently believing that he would not need much future medical care for this injury. The evidence supports this analysis.

As to plaintiff's claim of past wage loss and substantial future wage loss, again the jury heard conflicting, not overwhelming testimony concerning these losses, and granted a justifiable award for past wage loss but nothing for future wage loss against the City.

Plaintiff testified that due to his injury, he is unable to ever be a tractor trailer driver and this results in substantial future economic loss. However, plaintiff admitted that neither Dr. Gaines nor Dr. Rhodes, his treating physician, ever told him that he could not ever be a truck driver again (N.T. 6/10/92 at 74). He was fired at his truck driving job because he carried a gun. Plaintiff also testified about a variety of jobs he has held since August 1989, some of which paid him more than he was making at North–South Trucking at the time of the incident, and he was laid off by several of them not because he couldn't do the work. He added in his testimony that two (2) months prior to trial, he was laid off his job with a company called DEKA, but is now working there making $10.15 an hour which is more than he made before the layoff and substantially more than

---

**16.** To make sure the court understood what type of damages they were awarding, the jury wrote at the bottom of Interrogatory 20—"Paying for actual wage losses not future losses, plus past and future medical."

the $6.50 an hour he was earning on August 28, 1989 (N.T. 6/10/92 at 22–23, 65–66).

The jury also heard conflicting expert testimony from both sides concerning future economic loss. Dr. Bernard Albert, a psychologist in the field of vocational rehabilitation, testified that based on plaintiff's complaints and a review of the medical records that plaintiff would not be able to do all the duties required of a heavy truck driver (N.T. 6/15/92 at 33–60). The defendants' vocational expert, Dr. Philip Spergel, testified that based on his review of the medical evidence, considering that the doctors placed no specific physical limitation on the plaintiff that he could return to driving a tractor trailer. Dr. Spergel added that even if plaintiff couldn't go back to this job area, he could still earn between eight and twelve dollars per hour performing other jobs (N.T. 6/15/92 at 75–89).

"A court should not order a new trial merely because had it been a bench trial, it would have awarded a sum different from the sum the jury determined to be appropriate." *Maylie v. National R.R. Passenger Corp., supra.* Since the jury's damage award was not against the weight of the evidence based on the testimony and evidence presented, it would be improper for the trial court to substitute its judgment of the facts and credibility of the witness for that of the jury. *Lind v. Schenley Indus.,* 278 F.2d 79, 90 (3d Cir.) (en banc), *cert. denied,* 364 U.S. 835, 81

S.Ct. 58, 5 L.Ed.2d 60 (1960).[17] Accordingly, I cannot grant a new trial on this claim.[18]

## II. EXCLUSION OF EXPERT TESTIMONY FROM EVIDENCE

### A. Background

Plaintiff next motions for a new trial against defendant, the City of Philadelphia, on all issues of liability under § 1983, and damages on the grounds that I improperly excluded relevant and admissible expert testimony.

Specifically, plaintiff asserts that I "excluded relevant and admissible testimony from Dr. James Fyfe as to the basis for his opinion regarding police practices and procedures and the custom and practice of the City of Philadelphia in tolerating and demonstrating deliberate indifference to the improper use of deadly force by its police officers (including preventing Dr. Fyfe from testifying about shooting books that he reviewed involving specific cases of the discharge of firearms by police, the follow-up investigation and corrective action (non-action) taken by the Philadelphia Police Department, and/or about other cases of police misconduct which he had investigated or reviewed involving Philadelphia Police Officers.)"

Just prior to the start of this trial on June 9, 1992, defendants submitted a Motion in

---

17. Plaintiff's third claim concerning the verdict—that it would be a miscarriage of justice not to grant a partial new trial on damages against Officers Springer and Clift, will not be discussed under a separate heading since it is essentially the same argument as those raised in the first two verdict claims that have been discussed in detail *supra.*

Since I found that the verdict was not inadequate nor against the weight of the evidence, a logical conclusion of this is that I find that the verdict does not result in a miscarriage of justice. *See Williamson v. Consolidated Rail Corp., supra; EEOC v. Delaware Dept. of Health, supra; Roebuck v. Drexel University, supra.*

18. The plaintiff further asserts in their motion that the effect of the jury's verdict would be that the plaintiff would receive no award. It is argued that since the City of Philadelphia was only found liable for the officers' negligence and the officers were found to be less than fifty percent (50%) negligent, under Pennsylvania Compara-

tive Negligence Law, the City would not have to pay any of the damages awarded against them. However, at the hearing on this motion on September 2, 1992, the City agreed to pay the award assessed against them by the jury (N.T. 9/2/92 at 45).

Plaintiff also raised a claim in a footnote in their motion at page 10 that I gave an erroneous comparative negligence charge to the jury. However, no objection to this charge was raised by the plaintiff at the conclusion of my charge. In fact, David Michelman, Esquire, who represented plaintiff at the motion argument on September 2, 1992, withdrew this claim as a ground for appeal. He stated:

"Your Honor, you note we do not raise as an issue for appeal that incorrect instruction. We realize that no exception to it was taken at the time."

(N.T. 9/2/92 at 42).

Limine to preclude plaintiff's expert police witness, James Fyfe, Ph.D., from offering expert testimony based on "shooting books" [19] composed by the Philadelphia Police Internal Affairs Division, in order to establish a custom, policy, or procedure of the City of Philadelphia in handling of situations as occurred in the instant action. Defendants stated in their motion that the issue of fact and law in this case is whether or not the intentional discharge of the officers' weapons were acts of excessive force under the circumstances, and whether or not the City, by custom, practice, or policy, allows police officers to routinely violate the constitutional rights of its citizens by allowing its police officers to use excessive force under circumstances similar to the matter at hand. Defendant argues in the motion that the "shooting books" contain information about incidents which dealt with entirely unrelated, dissimilar discharges of firearms in various settings and that no incident in the books involved an "investigatory stop" as was the situation in the plaintiff's case. Defendants asked this court to preclude Dr. Fyfe from testifying about the "shooting books" under Federal Rules of Evidence 403 due to the lack of relevancy, materiality and the damages of unfair prejudice which would result from confusing the issues, ultimately misleading the jury (Defendants' Memorandum in Support of Motion in Limine at p. 3).

Over the next several trial days prior to Dr. Fyfe testifying, I painstakingly considered this motion by entertaining oral argument several times on this issue, carefully reviewing all briefs and case law submitted, including a 106–page report on the "shooting books" by Dr. Fyfe and later, outside the presence of the jury, going over each "shooting" to consider and make a decision as to its relevance and admissibility.

At the end of testimony on the first trial day, June 9, 1992, I heard some oral argument on this issue (N.T. 6/9/92 at 124–131),[20] and later studied the 106–page report of Dr. Fyfe's analysis of the "shooting books". On the next morning, June 10, 1992, I stated my concerns about what was contained in the report of Dr. Fyfe and ordered the parties to brief me on their positions (N.T. 6/10/92 at 4–5).

> THE COURT: ... But I have come to this conclusion, that I need to be thoroughly briefed as to what this expert is going to testify to, and how he is going to testify to it, and how you're going to justify that. I want to know exactly what he is doing. Because if it is your intention to go over every one of these cases that are listed in this 106–page note to me, then there has got to be a different way to do that and I don't feel that I am going to do that.
>
> Now, I'm not making a final decision, but if we had to do that, then every single item in that brief would have to be explained to the jury and then contested and cross-examination and et cetera. Every one of those cases would have to be analyzed.

. . . . .

---

19. The term "shooting books" was explained at trial (N.T. 6/9/92 at 122–123) by defendants' counsel, David Garcia–Villarreal:

> MR. GARCIA–VILLARREAL: Well, Your Honor, if I may, what it is, is upon the discharge of a firearm by any City of Philadelphia Police Officer, whether on duty or off duty, internal affairs conducts an investigation and that investigation is part of that book: It's the entire book and it deals, and your Honor, it has everything from the interviews—
>
> THE COURT: So, now we know that a shooting book is an investigative book or a book, a file, I guess you'd call it.
>
> MR. GARCIA–VILLARREAL: That's what it is, your Honor, an investigatory file.
>
> THE COURT: A file of the investigation?
>
> MR. GARCIA–VILLARREAL: Yes, your Honor.

THE COURT: And you call that a shooting book?

MR. GARCIA–VILLARREAL: For lack of a better term, yes, your Honor.

20. Plaintiff argued that the "shooting books" only dealt with plainclothes police officers' incidents and that Dr. Fyfe goes through shooting from 1987 to the time plaintiff was shot in August 1989 and that his opinion is trying to show that there is a custom and practice within Philadelphia of either not having policies or that the training is so poor that many mistakes and accidents involving the discharge of weapons occur and there is no discipline so it happens again and again (N.T. 6/9/92 at 125, 128). Defendants contend that the mere discharge of a weapon does not make it relevant to the case (N.T. 6/9/92 at 128).

I'm having trouble with the idea that we have—how many cases were in there? Let's say 29, that he considers wrongly decided. So, that means 29 cases have to be presented to the jury to let them know why he considers those cases wrongly decided. Then I have the city that's going to give me an explanation and evidence on 29 other cases, to say why it's rightly decided. That's not the issue in this case.

After briefs were submitted, further argument was heard on June 15, 1992 (N.T. 6/15/92 at 5–26).[21] Defendants asserted that in his report Dr. Fyfe repeatedly addresses accidental discharges, road blocks, bar fights, off-duty officers with a weapon, off-duty intoxicated officers, suicides, and domestic disputes involving officers, and that reference to these cases is completely irrelevant and highly prejudicial to them since the fact of this case is the intentional discharge of weapons because the officers felt in imminent danger of being harmed (N.T. 6/15/92 at 8).

Plaintiff's counsel, in response stated that they found four (4) of the twenty-nine (29) shootings in issue to be "good shootings",[22] but the other shootings should be used as a basis for Dr. Fyfe's opinion since all deal with plainclothes officers shootings (accidental or not) and that they show that there is no training prior to a uniformed officer being pulled for duty in plainclothes for a temporary period of time (N.T. 6/15/92 at 14–16).[23]

On the morning of June 16, 1992, outside the presence of the jury, I made the following statement to the parties:

THE COURT: Counsel for the defendant has filed a Motion in Limine. And I have had a chance to review it. I will make this brief comment for the record.

After consideration of the defendants' Motion in Limine to exclude certain testimony of plaintiff's expert witness, Dr. James Fyfe, upon consideration of the briefs and the cases submitted by the parties in support of their position, and following oral argument, I deny the Motion in Limine as stated.

Considering Federal Rules of Civil Procedure 702 at 703,[24] governing expert witnesses and what expert witnesses can rely upon in giving his or her opinion, I am denying the motion at this time, because I don't want to exclude any possible relevant or material testimony from Dr. Fyfe.

I have thoroughly reviewed each of the individual police shooting files—shooting cases that were submitted by Mr. Garcia, indicating that Dr. Fyfe would rely upon in giving an expert opinion. Individual police shootings are taken from information from material called "shooting books". These books, as I understand them, consist of individual files, composed by the Internal Affairs Unit of the Philadelphia Police Department, that review all cases where police officer discharges his weapon. And makes a determination whether the discharge was proper under the police regulations or violated any police policies.

I have weighed the relevant merits of each of the individual files from those that were submitted to me, as they were summarized by the plaintiff's expert. And I do not wish to open the testimony to review each of those cases where there is a different opinion between Dr. Fyfe and the authorities who reviewed the shooting.

---

**21.** More oral argument was heard on this issue on June 11, 1992 at 2–13.

**22.** Apparently, a "good shooting" refers to a shooting where the Police Internal Affairs Division or a police expert determine that the officer involved was at no fault in the incident where a weapon was discharged.

**23.** Defendants also stated during this oral argument that they concede that under Fed.R.Evid. 703, there is no argument as to whether a shooting book is a document or series of documents that an expert would reasonably rely upon. "That's not the issue." (N.T. 6/15/92 at 18).

Fed.R.Evid. 703—*Basis of Opinion Testimony by Experts* provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

**24.** At this point of the statement, I inadvertently referred to Rules 702 and 703 as Federal Rules of Civil Procedure instead of Federal Rules of Evidence as I had intended.

Where there may be differences in the basic facts, such a review would require the jury to hear each case and decide the merits of each case. I feel that that explanation brings in substantial issues of factual comparison which are not consistent with the facts of this case.

Under Federal Rule 403, concerning exclusion of evidence on the grounds of prejudice, confusion or waste of time, I believe that the probative value of having Dr. Fyfe testify on each of the individual police shootings submitted by the plaintiff and relying on them to give an expert opinion is substantially outweighed by the danger of unfair prejudice and confusion of the issues. Especially to the civilian defendants.

I therefore will leave it up to defense counsel to object to these cases at the appropriate time if such cases are used for the basis of the expert's opinion, on whatever basis he finds appropriate.

For the record, I want it noted that although this motion was filed on the opening day of the trial, I have reviewed the 106 pages summarizing the cases upon which the plaintiff's expert contends to rely and I have also required all counsel to submit briefs on these issues. In addition, I have examined all the cases cited to me as supporting the respective party's position and on that balancing of interest, I exercise my discretion to limit the testimony, which I feel will unduly prolong the trial, by reviewing each case to determine whether they were rightly decided by the city authorities who were charged with that responsibility.

I understand there are at least 29 cases, with a general reference to many more. I have reviewed the Paoli case, the Japanese electronic case, the Carter case, the Spell case.[25] I have reviewed the law as far as

procedure is concerned. And in order to accomplish this efficiently, I have decided to give you an opportunity to make a presentation on whatever it is that you intend to present and that I will rule accordingly outside the presence of the jury, who are not in the courtroom at this time.

(N.T. 6/16/92 at 2–4).

I then heard an offer of proof from the plaintiff as to the relevancy of each of the twenty-five (25) shootings involved to the instant case and argument from the defendants (N.T. 6/16/92 at 9–74).[26] After careful consideration of arguments made, I made the following decision:

> THE COURT: I have reviewed all the business that we did this morning. And I have sustained the objection in each one of these examples, for various reasons that were cited in the cases that I have read and in one or two incidences which could be used I have found that it is not sufficient to establish a custom or usage.

(N.T. 6/16/92 at 75).

### B. *Discussion*

■ I am fully aware that the Third Circuit has taken a liberal approach to the introduction of expert testimony by allowing experts to base their opinions on data that is reasonably relied upon by other experts in the field. There is no separate requirement that the court itself find the data to be trustworthy. *In re Japanese Electronics Products Antitrust Litigation,* 723 F.2d 238 (3d Cir.1983), *rev'd on other grounds sub nom, Matsuskita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Mazur v. Merck & Co., Inc.,* 742 F.Supp. 239 (E.D.Pa. 1990); *Villari v. Terminix Intern, Inc.,* 692 F.Supp. 568, 571 (E.D.Pa.1988).

---

**25.** *In Re Paoli R.R. Yard PCB Litigation, 916 F.2d 829 (3d Cir.1990); In Re Japanese Electronic Products, 723 F.2d 238 (3d Cir.1983); Carter v. District of Columbia, 795 F.2d 116, 125 (D.C.Cir. 1986); Spell v. McDaniel, 824 F.2d 1380 (4th Cir.1987).*

**26.** As mentioned earlier, four (4) of the twenty-nine (29) books were considered "good shootings" and were not presented for review. The shootings listed below, as they are identified by number in Dr. Fyfe's report, were considered:

| | | |
|---|---|---|
| 87–38 | 87–16 | 89–06 |
| 87–43 | 87–30 | 87–05 |
| 88–03 | 87–39 | 89–10 |
| 88–38 | 88–08 | 87–12 |
| 88–49 | 88–24 | 88–28 |
| 87–06 | 88–71 | 89–17 |
| | | 88–48 |

■ In fact, I did not exclude Dr. Fyfe's reliance on the "shooting books" from evidence in forming an expert opinion under Fed.R.Evid. 702[27] or 703,[28] as plaintiff mistakenly argues in his brief in support of this claim.[29] A casual reading of the record indicates that I denied defendants' Motion in Limine under these federal rules of evidence, but excluded testimony on the "shooting books" under Fed.R.Evid. 402[30] and 403.

Even if expert testimony were held to be admissible under Fed.R.Evid. 702 and 703, Fed.R.Evid. 403 provides an independent means for excluding expert testimony. *Hines v. Consolidated Rail Corp.*, 926 F.2d 262 (3d Cir.1991). Fed.R.Evid. 403 provides:

Although relevant, evidence may be excluded its probative value is substantially outweighed the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The Third Circuit has held that the trial judge has considerable discretion under Fed. R.Evid. 403. *Cowgill v. Raymark Industries, Inc.*, 832 F.2d 798 (3d Cir.1987); *United States v. Rockwell*, 781 F.2d 985 (3d Cir. 1986); *United States v. Long*, 574 F.2d 761 (3d Cir.1978), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978).

The *Long* Court, *id.* at 767, stated that "[i]f judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." The Court added that the trial judge should not be reversed simply because an appellate court believes that it would have decided the matter otherwise because of differing views of highly subjective factors of the probative value or the prejudice presented by the evidence.

In addition, testimony concerning these twenty-five (25) shooting books would have required a separate mini-trial for each to determine whether the decision of the Philadelphia Police Review Board as to each one was right or wrong.[31] The plaintiff would have had to present specific facts on each shooting and the defendants would have had to cross-examine on each one. It is clear that this would have taken a substantial amount of time to do, would have confused the central issue of the case, and mislead the jury[32] by introducing factual scenarios not related to the facts of this case. Accordingly, I used my discretion as the trial judge under Fed.R.Evid. 403 (*see also, Cowgill v. Raymark Industries, Inc., supra.*) and found that even if the "shooting books" were relevant (which I found they were not), their probative value was substantially outweighed by

**27.** Fed.R.Evid. 702—*Testimony by Experts* states:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
The facts of this case are not the data referred to in this rule.

**28.** *See* footnote 25, *supra.*

**29.** In fact, as mentioned *supra*, in footnote 25, defendants conceded that the "shooting books" were admissible under Fed.R.Evid. 703. I have found them not admissible for other reasons explained herein.

**30.** Fed.R.Evid. 402 provides:

*Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible*
All relevant evidence is admissible, except as otherwise provided by the Constitution of the

United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

**31.** Several of these cases involved accidental discharges, bar fights, off-duty officer weapon discharges, off-duty intoxicated officers, officer domestic disputes and even suicides. None involved a similar situation as this case.

**32.** The court considered the fact that maybe the "shooting books" could have been introduced into evidence in another way. For example, of the twenty-five (25) shootings, it could have been offered that statistically, ten (10) were accidental discharges, five (5) were off-duty weapon discharges, etc. However, this was rejected because the court would have run into the same problem on cross-examination because the defendants wouldn't simply accept Dr. Fyfe's opinion that these shootings were wrong, but would have had to cross-examine him on the facts of each one, thus creating twenty-five (25) mini trials.

the danger of unfair prejudice to the defendants.[33]

Furthermore, plaintiff was not prejudiced by the exclusion of this evidence, since he was able to get into evidence significant testimony from Philadelphia Police Lieutenant Joseph Bonn, Officers Springer and Clift, and Dr. Fyfe, about custom, policy, or procedure concerning the Philadelphia Police Department's handling of these situations in order to prove a claim against the City under § 1983.

Lieutenant Bonn, who was the first police superior on the scene of the shooting and whose responsibility it was to secure the area so it could be processed by the investigators, testified that there is no training for uniformed police officers to do plainclothes police work and there is no training to identify oneself as a police officer—no standard phraseology (N.T. 6/11/92 at 2–3, 51–52). Officer Springer also testified that there is no training for plainclothes officers nor was there a procedure, policy, or directive which directs plainclothes officers when pursuing an armed person (N.T. 6/16/92 at 85, 101). Officer Clift testified it was his first day as a plainclothes officer after several years on the force, yet, he received no specific training for plainclothes work (N.T. 6/16/92 at 175), any different than uniformed work.

Although being precluded from testifying as to the twenty-five (25) "shooting books" at issue, Dr. Fyfe testified extensively about wrongful police policies and practices of the City of Philadelphia which violated plaintiff's constitutional rights. He stated that plainclothes officers must receive specific training different from that of uniformed officers and that all the major police departments that he was familiar with would not assign a uniformed officer to plainclothes until they had gotten specific training. Philadelphia was

the only department that didn't provide such training, he stated. He also testified that directives from the department were not good enough and that it was training that was needed (N.T. 6/17/92 at 44–70).

Dr. Fyfe went on to testify that the Philadelphia Police Department violated standard police policies in six (6) areas involving this case:

1. Philadelphia Police Department not training plainclothes officers for this type of duty or putting officers who had little or no experience with no training into plainclothes duty violated standard police policy;

2. Absence of such training demonstrates deliberate indifference to the lives, safety, and rights of citizens as well as police officers;

3. Absence of a standard challenge violates standard police policies;

4. Absence of a requirement that plainclothes officers notify headquarters by radio in potentially violent or dangerous situations violated standard police policies;

5. Lack of policy or training that officers or plainclothes officers plan or coordinate their approaches upon a suspect violated standard police policies; and

6. Lack of in-service training of how to handle these situations violates accepted police policies.

(N.T. 6/17/92 at 103–108).

From the above summarized testimony, it is apparent that the jury heard substantial testimony that could justify a verdict holding the City liable under § 1983. However, it must be pointed out that they also heard conflicting testimony. Officer Springer testified that officers receive numerous extra po-

---

**33.** Plaintiff also claims that the court erred in requiring counsel to demonstrate the relevance of the documents upon which his expert based his opinion. Plaintiff states that it is the burden of the defendants under Fed.R.Evid. 705 to expose the weaknesses of their expert's opinion. The court did not challenge the data but the facts of the books as evidence.

Fed.R.Evid. 705 provides:

*Disclosure of Facts or Data Underlying Expert Opinion*

The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

However, as explained above, this is exactly what the court was seeking to avoid in making the decision it did. Cross-examination of each of the twenty-five (25) shooting incidents would have resulted in twenty-five (25) mini-trials.

lice training—whether it be at the academy, roll call, TV training, bulletins that are constantly up-dating information and procedures, and that officers go through forty (40) hours of refresher courses every year (N.T. 6/16/92 at 86, 109). Officer Clift reiterated this and testified that officers receive updated bulletins on particular issues. At roll call, the sergeant would explain exactly what the update meant and how to use it (N.T. 6/16/92 at 181). In addition, defendants' expert, Louis Reiter, testified that plainclothes officers do essentially the same work as uniformed officers and don't need special training. He also testified that there is no one specific way to identify oneself as an officer and that Officers Springer's and Clift's pursuit of the plaintiff was done in an acceptable police standard (N.T. 6/17/92 at 199–209).[34] He contradicted Dr. Fyfe in every contention.

As it is their function, the jury weighed the evidence and credibility of the witnesses and decided not to find the City liable under § 1983. In conclusion, I believe I properly excluded expert testimony concerning the "shooting books" under Fed.R.Evid. 402 and 403, and, in addition, plaintiff was not prejudiced in any way by this ruling.[35]

34. Apparently, plaintiff believed that they presented sufficient evidence to hold the City liable under § 1983. . After the defendants motioned for a directed verdict to dismiss the City from the case, and argued that inadequate training with a single incident is not enough to establish custom, practice or policy of inadequate training, co-counsel, Marlene Fleming, Esquire, argued that the testimony of Lt. Bonn and Officers Springer and Clift establish that the policy makers of the City can reasonably be said to have deliberate indifference to the need of training. She added: "[a]nd I think we have met that burden substantially." (N.T. 6/18/92 at 11–17).

35. In addition, in my charge to the jury, I noted that a good deal of testimony was produced regarding inadequacy of training under § 1983. The charge read:
Now we have inadequacy of training. A good deal of testimony was—produced regarding that and I'll instruct you in that regard.
Inadequacy of training may serve as a basis for a finding of liability under that section that I read, 1983, where the failure to train amounts to deliberate indifference to the Constitutional rights of persons with whom the police may come into contact.
It may happen that in light of the duties assigned to specific officers or employees, the need

## III. EXAMINATION OF EXPERTS ONLY BY HYPOTHETICAL QUESTIONS

Plaintiff, lastly, motions for a new trial on the basis that it was an error and/or abuse of discretion for the court to require examination of expert witnesses *exclusively* by hypothetical questions. This is simply not true.

It is stated in plaintiff's brief at page 32 that Fed.R.Evid. 705 eliminated the requirement to use hypothetical questions, "unless the court requires otherwise."[36] Plaintiff then acknowledges "the discretion of the court to do so is clear." However, plaintiff argues that for the court to "require otherwise" in the middle of direct examination of plaintiff's expert was an abuse of discretion. I find no basis for this statement. The court has the power and duty to stop or strike testimony in its discretion.

It is contended by the plaintiff that, "this ruling like the exclusion of plaintiff's expert opinion basis ruling, again required plaintiff to completely revise his direct examination of his expert. [Plaintiff's counsel was given the lunch break to do so.] The resulting testimo-

for more or different training is so obvious and the inadequacy so likely to result in a violation of the Constitution that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need.
In that event, the failure to provide proper training may fairly be said to represent a policy which the City may be liable if it actually causes injury. A municipality may be liable under 1983 only where its policies are the moving force behind the Constitutional violation.
Only where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a City policy or custom that is actionable under the law.
(N.T. 6/19/92 at 14).

36. Plaintiff is citing the "Notes of the Advisory Committee" dealing with Fed.R.Evid. 705. These notes state in part ... "Unless the court orders otherwise, questions calling for the opinion of an expert witness need not be hypothetical in form, and the witness may state his opinion and reasons without first specifying the data upon which it is based. Upon cross-examination, he may be required to specify the data...."

ny following the court's order was confusing, difficult to follow, boring and annoying to the jury as judged by plaintiff's counsel from the differing jury reactions to the two (2) types of testimony." (Plaintiff's brief at 33).

In addressing this issue, I state, initially that under Fed.R.Evid. 705, I clearly have the discretion to require that hypothetical questions be used in questioning experts, if I so desire. Plaintiff's counsel at least admits to this much. However, let it be strongly noted that I take personal offense to counsel's blatant and flagrant distortion of the facts, as is reflected in the trial record, concerning my conduct and rulings on expert testimony, especially that of Dr. Fyfe.[37] Counsel begins such distortion of the truth in her initial heading of this argument in her brief at 31. This heading states that I required examination of expert *witnesses exclusively* by hypothetical questions (emphasis added). Dr. Fyfe testified on June 17, 1992. Counsel either intentionally or erroneously neglected to add in her brief that several expert witnesses testified prior to him [38] and at no time did I require either party to use hypotheticals "exclusively" in questioning them. This was not necessary since both parties asked proper questions of their ex-

perts and the experts answered responsively, staying within their function as experts.

Counsel also distorted the facts concerning Dr. Fyfe's testimony. A casual reading of the record clearly indicates that when Dr. Fyfe began his testimony (N.T. 6/17/92 at 40), I did not require counsel to question him "exclusively" by the use of hypotheticals. Dr. Fyfe's testimony started out with counsel asking direct questions and Dr. Fyfe responding to them. However, as the questions continued, Dr. Fyfe, instead of simply being responsive to the questions, would take off and analyze evidence, make credibility judgments as to witness' testimony, and then make speeches to the jury (see testimony of Dr. Fyfe, 6/17/92 at 40–80). At one point during testimony, Dr. Fyfe makes a several minute uninterrupted speech to the jury judging the credibility of several witness' testimony (see testimony of Dr. Fyfe, 6/17/92 at 72–80).[39] Finally, there was an objection by defendants' counsel and I stated to plaintiff's counsel that I felt Dr. Fyfe was making argumental speeches to the jury and suggested the use of hypotheticals to confine his testimony to his expertise.

---

37. Plaintiff's co-counsel at trial, N. Marlene Fleming, Esquire, authored this brief in support of the Motion for a Partial New Trial.

38. John Kliniewski, plaintiff's ballistics expert, testified on June 11, 1992 at N.T. 23–70.

Dr. Bernard Albert, plaintiff's vocational expert, testified on June 15, 1992 at N.T. 33–73.
Dr. Philip Spergel, defendants' vocational expert, testified on June 15, 1992 at N.T. 74–105.

39. An example of the testimony from Dr. Fyfe at N.T. 76–77 is as follows:

The next opinion is that the officers failed to properly identify themselves in this situation. I said earlier that police officers have to have a standard challenge for situations like this. They must have that. And there must be no doubt about what they say. This apparently was a very noisy situation and I conclude that from a couple facts. One is that he was not even sure what he heard Springer say. He heard Springer say police who, or police what and he was just on the other side of the car from Officer Springer and he was expecting Springer to say something.

So, if he didn't hear that, what did Strauss, who was not expecting this, hear? He didn't hear that. Officer Springer indicates that he

also identified himself by having his badge on his gun buckle, or on his belt. But he doesn't know whether he was standing behind the car door. I don't know how you could see, I don't know how you could see—Officer Springer indicates that Mr. Strauss was leaning toward the car.

All Mr. Strauss had on was a pair of slacks, a white shirt and this big, shiny, 357 magnum on his right hip, which was facing directly at Springer and Clift from seven feet away. And they say they didn't see the gun, but they expected Mr. Strauss to see this badge on Officer Springer's.

But he doesn't know whether he was behind the car door and he also doesn't know if he was wearing his shirt outside his pants. And in my experience it's very likely that he was wearing his shirt outside his pants, because that's the way police officers who are working in plainclothes conceal their guns. They don't walk around with a shirt and pants and a gun sticking out of their belt. They wear their shirts out looking sloppy and hidden.

It is apparent from this testimony that Dr. Fyfe was weighing the credibility of the testimony of several witnesses, including: Officers Springer and Clift, James Strauss, and Acme Security Guard Paul Minter.

**1228**

"THE COURT: And I don't think this is the proper way to make the presentation. This is an argument to the jury. You might as well stop the case and have you eliminate the possibility of you making an argument to the jury. A hypothetical question focuses the question on specific facts."

(N.T. 6/17/92 at 81).

There was then some explanation to plaintiff's counsel concerning how his remaining questions should be organized and posed to Dr. Fyfe in order to get proper responsive answers. After this explanation, plaintiff's counsel still did not seem to understand that my purpose was to simply have Dr. Fyfe focus his answers on the questions asked, instead of making speeches to the jury, which is what he clearly did in much of his previous testimony. I then recessed for lunch to give counsel time to prepare acceptable hypothetical questions or questions that could be answered without making speeches.[40]

Upon resuming direct examination, Dr. Fyfe testified fully and responsively to a series of questions in quasi-hypothetical form. These questions were asked and an-

swered without the expansive references previously described and without any limitation by the court (N.T. 6/17/92 at 96–110).

The record clearly indicates Dr. Fyfe was not limited in presenting his expert testimony[41] and was surely not required to give expert testimony "exclusively" by hypothetical questions since for most of his testimony he was allowed to overstep the bounds of his function, weigh testimony, and make arguments to the jury.[42] It was only when his testimony repeatedly went beyond his function as an expert was he required to focus his answers and to be responsive to the questions.[43]

Furthermore, plaintiff was not prejudiced by my instructions to Dr. Fyfe since the defendants' police expert, Louis Reiter, testified only in response to hypothetical questions asked by defendants' counsel, although I did not require the questions to be posed only in this form[44] Mr. Reiter answered all of counsel's questions responsively within his function as an expert. He did not expound on testimony and evidence not given to him in the questions asked and refrained from making arguments or speeches to the jury[45] (N.T. 6/17/92 at 190–210).

**40.** In plaintiff's counsel's brief at 33, it is asserted that counsel was somehow prejudiced by only having the lunch break to completely revise the direct examination of the expert. This contention has no merit.

**41.** With the exception that I had already precluded testimony concerning the "shooting books".

**42.** Counsel also asserts in her brief that after Dr. Fyfe's testimony was limited to answering hypotheticals, her observations was that the jury was bored and confused. This, of course, is a subjective matter of interpretating people's actions and feelings.

**43.** In order to avoid any prejudice to the jury concerning the events surrounding Dr. Fyfe's testimony, I gave the jury the following instruction:

"We had a slight episode with one of the expert witnesses, and a comment I believe of Mr. McGill even in closing arguments said that the Court was angry. The Court was not angry at Dr. Fyfe. A question was asked of Dr. Fyfe, he understood it a certain way and I ruled against that way. I advised Mr. McGill how I felt about it, you were here, and Mr. McGill revised his

question. We recessed so a different type of question could be asked of the witness when the witness came back on the stand, he complied with the rules that I set about. And there is nothing personal involved with that and I want you to understand that.

I don't know that I get angry over rulings, but let's just say that that's not the proper word to use under the circumstances and that everybody did exactly what they were supposed to do. I made a correction, the correction was adhered to and there is no problem with it."
(N.T. 6/19/92 at 6–7).

**44.** Defendants' counsel, Mr. Garcia–Villarreal began his direct examination of Louis Reiter by stating in part:

"Mr. Reiter, you were also here this morning and I'm going to present a hypothetical to you and I'm going to base the facts of those hypotheticals as to what we feel, the defense feels, are the facts in the case...."

**45.** In fact, Mr. Reiter several times during his testimony began his answer to a question by stating, "based on your hypothetical ..." (N.T. 6/17/92 at 210, 211, 213, 216).

Thus, this claim, like the others raised by the plaintiff in this motion, cannot stand as a ground in order to grant a new trial under

Fed.R.Civ.P. 58.[46] Therefore, plaintiff's Motion for a Partial New Trial is denied.

**46.** Apparently, plaintiff's co-counsel, Joseph McGill, Esquire, was pleased in my handling of the trial, since he went out of his way during his closing to state to the jury:

"I'd certainly like to thank the court for your patience and I thank very much the judge for his fairness in this proceeding. No matter what your decision is, and I'll say it now, no matter what your decision is, the judge has done everything he could to be even handed to both sides. And this is something that certainly the plaintiff and I'm sure the defendants appreciate very much."
(N.T. 6/18/92 at 64).

This case was very well tried by plaintiff's counsel, Joseph McGill and defendants' attorney, David Garcia–Villareal. They conducted themselves as gentlemen with graciousness and courtesy at all times. The case had different meanings to them, but the high expectations were not supported by the evidence.

APPENDIX A

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES E. STRAUSS,<br>Plaintiff | : | CIVIL ACTION |
| | : | |
| VS. | : | |
| | : | |
| RICHARD SPRINGER,<br>AND<br>ROBERT CLIFT,<br>AND<br>THE CITY OF PHILADELPHIA,<br>Defendants | :<br>:<br>:<br>:<br>:<br>: | NO. 91-439 |

**INTERROGATORIES**

1. Do you find that defendant, Richard Springer, deprived plaintiff, James Strauss, of his constitutional rights by using excessive force against plaintiff on August 28, 1989?

 Yes __X__ No _____

 If you answered "no" to Question 1, do not answer Question 2, and go to Question 3. If you answered "yes" to Question 1, go on to Question 2.

2. Did defendant, Richard Springer's use of excessive force proximately cause any of plaintiff's injuries?

 Yes __X__ No _____

 Go on to Question 3.

3. Do you find that defendant, Robert Clift, deprived plaintiff, James Strauss of his constitutional rights by using excessive force against plaintiff on August 28, 1989?

 Yes __X__ No _____

1

If you answered "no" to Question 3, do not answer Question 4, and go to Question 5. If you answered "yes" to Question 3, go on to Question 4.

4. Did defendant, Robert Clift's use of excessive force proximately cause any of plaintiff's injuries?

Yes __X__ No _____

Go on to Question 5.

5. Do you find that defendant, City of Philadelphia, had a custom, policy or regulation which deprived plaintiff, James Strauss, of his constitutional rights?

Yes _____ No __X__

If you answered "no" to Question 5, do not answer Question 6, and go to Question 7. If you answered "yes" to Question 5, go on to Question 6.

6. Did defendant, City of Philadelphia's deprivation of
*SKip* plaintiff's constitutional rights proximately cause any of plaintiff's injuries?

Yes _____ No _____

7. Do you find that defendant, Richard Springer, committed an assault and battery on plaintiff, James Strauss, on August 28, 1989?

Yes _____ No __X__

If you answered "no" to Question 7, do not answer Question 8, and go to Question 9. If you answered "yes" to Question 7, go on to Question 8.

2

8. Did defendant Richard Springer's assault and battery on
**SKiP** plaintiff, James Strauss, result in harmful or offensive contact with the plaintiff?

Yes _____ No _____

9. Do you find that defendant, Robert Clift, committed an assault and battery on plaintiff, James Strauss, on August 28, 1989?

Yes _____ No. ___X___

If you answered "no" to Question 9, do not answer Question 10, and go to Question 11. If you answered "yes" to Question 9, go on to Question 10.

10. Did Robert Clift's assault and battery on plaintiff, James
**SKiP** Strauss, result in harmful or offensive contact with the plaintiff?

Yes _____ No _____

11. Was the defendant, Richard Springer, negligent in his actions
APPREHENSING
in ~~arresting~~ plaintiff, James Strauss?

Yes ___X___ No _____

If you answered "no" to Question 11, do not answer Question 12, and go to Question 13. If you answered "yes" to Question 11, go on to Question 12.

12. Was the defendant Richard Springer's negligence a proximate cause of any injury to the plaintiff?

Yes ___X___ No _____

13. Was the defendant, Robert Clift, negligent in his actions in
APPREHENSING
~~arresting~~ plaintiff, James Strauss?

Yes ___X___ No _____

3.

If you answered "no" to Question 13, do not answer Question 14, and go to Question 15. If you answered "yes" to Question 13, go on to Question 14.

14. Was the defendant, Robert Clift's negligence a proximate cause of any injury to the plaintiff?

Yes __X__ No _____

15. Was the plaintiff, ~~Robert~~ JAMES Strauss, contributorily negligent?

Yes __X__ No _____

If the answer to Question 15 is "no", you will proceed to Question 18. If the answer to this question is "yes", you will go to Question 16.

16. Was the contributory negligence of the plaintiff, ~~Robert~~ JAMES Strauss, a proximate cause of any injury or damage plaintiff suffered?

Yes __X__ No _____

Go on to Question 17.

17. Taking the combined negligence that was a proximate cause in bringing about the plaintiff's injuries as 100 percent, what percentage of that negligence was attributable to the defendants and what percentage was attributable to the plaintiff?

Percentage of negligence attributable to the defendants Richard Springer and Robert Clift?

__40__ %

Percentage of negligence attributable to the plaintiff?

__60__ %

1234

(The Court will reduce plaintiff's award, if any, by the percentage of contributory negligence found if any.)

Answer Question 18 only if you answered "yes" to Questions 11 and 12.

18. Is the City of Philadelphia liable for the negligence of defendant, Richard Springer?

Yes __X__ No _____

Answer Question 19 only if you answered "yes" to Questions 13 and 14.

19. Is the City of Philadelphia liable for the negligence of defendant, Robert Clift?

Yes __X__ No _____

5

20. State the amount of compensatory damages, if any, plaintiff James Strauss, has proven against each defendant for:

Answer Question 21 only if you answered "yes" to one of Questions 2 or 8.

| | Richard Springer | Robert Clift | City of Philadelphia | Total |
|---|---|---|---|---|
| Past Medical Expenses | $ N/A | $ N/A | $ 5260.11 | $ 5260.11 Total |
| Future Medical Expenses | $ | $ | $ 2500.00 | $ 2500.00 Total |
| Past Loss of Earnings | $ | $ | $ 4000.00 | $ 4000.00 Total |
| Future Loss of Earnings | $ | $ | $ 0.0 | $ 0.0 Total |
| Past Pain and Suffering | $ | $ | $ 0.0 | $ 0.0 Total |
| Future Pain and Suffering | $ | $ | $ 0.0 | $ 0.0 Total |

Paying for Actual WAGE Losses Not Future Losses
Plus Past & Future Medical.

Answer Question 21 only if you answered "yes" to one of Questions 2 or 8.

21. Was defendant Richard Springer's actions willfully, maliciously, wantonly with reckless disregard for plaintiff's constitutional rights?

Yes _____ No ___X____ .

Answer Question 22 only if you answered "yes" to Question 21.

22. State the amount of punitive damages, if any, you award to plaintiff James Strauss against defendant Richard Springer.

SKip

$_____

Answer Question 23 only if you answered "yes" to one of Questions 4 or 10.

23. Was defendant Robert Clift's actions willfully, maliciously, wantonly with reckless disregard for plaintiff's constitutional rights?

Yes _____ No ___X____

Answer Question 24 only if you answered "yes" to Question 23.

24. State the amount of punitive damages, if any, you award to plaintiff, James Strauss and against defendant Robert Clift.

SKip

$_____

_6|19/43_
Date

Thomas J. Quimn
Foreperson

7